T.C. Memo. 2009-76

UNITED STATES TAX COURT

MARVIN S. AND THELMA S. KERZNER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21336-06.                    Filed April 6, 2009.

Using proceeds of loans from a wholly owned
partnership, Ps made annual loans of identical amounts to a
wholly owned S corporation, which in turn paid equivalent
amounts of rent back to the partnership.  In certain years
Ps also lent the S corporation additional amounts.  R
disallowed the S corporation's passthrough losses to Ps for
the 2001 tax year, asserting that Ps lacked a sufficient
basis under sec. 1366(d)(1), I.R.C.

<u>Held</u>:  Ps did not acquire a basis in indebtedness of
the S corporation from the annual loans since the
transaction involved a circular flow of funds and,
therefore, Ps had made no economic outlay.

<u>H. Peter Olsen</u> and <u>Frederick P. McClure</u>, for petitioners.

<u>Frank W. Louis</u>, for respondent.

MEMORANDUM OPINION

NIMS, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income tax as follows:

| <u>Year</u> | <u>Deficiency</u> |
|------|------------|
| 1996 | $20,440 |
| 1997 | 9,804 |
| 1998 | 593 |
| 2001 | 20,534 |

The issue for decision is whether petitioners made an economic outlay on yearly loans to their S corporation, giving them a sufficient basis in indebtedness under section 1366(d)(1) to claim the S corporation's losses in 2001 and carry back the resulting excess net operating loss to the 1996 and 1997 tax years.

Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the years in issue.

<u>Background</u>

This case was submitted fully stipulated pursuant to Rule 122.  The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.

Petitioners filed a timely 2001 Form 1040, U.S. Individual Income Tax Return, and a Form 1045, Application for Tentative Refund, in which they claimed a passthrough loss from Highland

Court, Inc. (HCI), for the year and carried the resulting excess net operating loss back to the 1996 and 1997 tax years. Respondent sent petitioners notices of deficiency for the 1996, 1997, 1998, and 2001 tax years, and petitioners filed a petition in response thereto. Petitioners resided in Rhode Island when they filed their petition.

In 1986 petitioners formed the Highland Court Associates partnership (HCA) and HCI, an S corporation within the meaning of section 1361(a). Since that time, each petitioner has continued to be a 50-percent partner and a 50-percent shareholder, respectively, in the two entities.

HCA borrowed money from a third-party lender to acquire and construct real property. The loan (HUD loan) was a nonrecourse loan which fell under section 232 of the National Housing Act. HCA, with Marvin Kerzner (Dr. Kerzner) signing as general partner, eventually refinanced the HUD loan with Reilly Mortgage Group, Inc. (Reilly) on August 28, 1997, in the amount of $4,335,000. Reilly was given a security interest in certain property of HCA, which included the notes from petitioners referred to below.

The parties have stipulated that Internal Revenue Service Tech. Adv. Mem. 200619021 (May 12, 2006)(TAM), relates to this case and that the statement of facts in the TAM "[is] herewith

incorporated by reference as though separately set forth in this stipulation of facts." Consequently, we also rely herein to a substantial extent on that statement of facts.

For each year from 1986 to 2001 HCA lent money to petitioners, petitioners lent money to HCI, and HCI paid rent to HCA. Under the terms of the HUD loan no portion of that loan's proceeds could be used in the loan arrangements among petitioners, HCA, and HCI. Loans from HCA to petitioners were permitted only if the third-party lender approved, if the proceeds were made from HCA's net profits (after debt service to HUD), and if the proceeds were used to fund HCA's activities. For each loan between HCA and petitioners and between petitioners and HCI, notes were drafted near the end of the calendar year and within a short time of each other. Each note included the total outstanding loan balance and, therefore, revised and superseded the loan notes issued in the prior year. Each note required no principal payments until the end of the following year. Most of these notes stated an interest rate, but the notes petitioners issued to HCA from 1996 through 1999 did not.

Proceeds of the loans from HCA to petitioners were deposited into one of several personal bank accounts held by Dr. Kerzner individually or jointly with his wife. The loans were booked as "Other Current Assets" that were "Due from Partners" on HCA's balance sheet. As a result of the flowthrough aspects of the

partnership, petitioners reported the interest income yearly on their Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., and B, Interest and Ordinary Dividends. They deducted a corresponding investment interest expense on their Schedule A, Itemized Deductions.

Funds for the loans from petitioners to HCI (yearly loans) were issued out of one of petitioners' personal bank accounts and deposited into HCI's bank accounts. These loans are reflected on HCI's balance sheet as "Loans from Shareholder". HCI did not deduct accrued interest expense for tax purposes, and petitioners did not report accrued interest income as part of their gross income.

Petitioners made additional loans to HCI in 2000 and 2001 (additional loans) of $70,551 and $50,000, respectively.

Aside from a $14,233 repayment of principal during the 1993 tax year by HCI to petitioners, no payments of principal or interest were ever made on any of these notes. After the 1999 year, pursuant to requirements imposed by HUD, the loans were combined into a single surplus cash note issued by HCI to petitioners. The surplus cash note stated an interest rate.

Regardless of which specific accounts were involved, petitioners used one of their personal accounts to deposit all

loan proceeds from HCA and to write all checks to HCI.  In every case, both the receiving and lending of funds by petitioners occurred within a short time of each other.

In 2001, specifically, the flow of activity among HCA, petitioners, and HCI was as follows:

- HCA issued petitioners a check in the amount of $80,000 on December 24, 2001.  The check was deposited into their personal checking account on December 26, 2001.

- Petitioners issued to HCI an $80,000 check from their personal rental checking account on December 24, 2001.  The check was deposited into the HCI business checking account on the same day.

- Petitioners wrote an additional $50,000 check to HCI out of their personal checking account on December 27, 2001.  The check was deposited into the HCI checking account on the same day.

Petitioners also wrote off $453,098 of accrued interest on loans to HCI in 2001 by making an entry on HCI's books to reclassify the amount from accrued interest payable to additional paid-in capital.  The entry was made to reduce the accrued interest to coincide with the surplus cash note balance.  The reclassification entry reflected Dr. Kerzner's assent to HUD's request to recalculate accrued interest on the basis of net advances rather than gross amounts outstanding.

For the 1986 through 2001 tax years petitioners claimed passthrough losses from HCI. They dispute respondent's determination that 2001 losses from HCI should be suspended because of a lack of bases in stock and indebtedness, which caused an alleged $130,905 increase in taxable income for 2001. They also dispute the disallowance of a previously allowed carryback of the net operating loss to petitioners' 1996 and 1997 years and alleged increases in taxable income for 1996 and 1997 in the respective amounts of $105,255 and $15,354.

Petitioners have conceded all other adjustments proposed in the notices of deficiency, other than consequential computational adjustments.

## Discussion

In determining tax liability for the year in which an S corporation's taxable year ends, section 1366(a) requires shareholders to take into account their pro rata shares of: (1) The corporation's income, losses, deductions, and credits whose separate treatment could affect the tax liability of any shareholder and (2) its non-separately computed income or loss. The aggregate amount of losses and deductions for any taxable year cannot exceed the sum of the shareholder's adjusted bases in the corporation's stock and any indebtedness of the S corporation to the shareholder. Sec. 1366(d)(1).

In order to acquire basis in indebtedness of an S corporation, the caselaw has required that:  (1) The indebtedness run directly from the S corporation to the shareholder and (2) the shareholder make an actual economic outlay that renders him poorer in a material sense.  Underwood v. Commissioner, 63 T.C. 468 (1975), affd. 535 F.2d 309 (5th Cir. 1976); Perry v. Commissioner, 54 T.C. 1293, 1296 (1970), affd. per order 27 AFTR 2d 71-1464, 71-2 USTC par. 9502 (8th Cir. 1971); Kaplan v. Commissioner, T.C. Memo. 2005-218.

There is no question that an indebtedness runs directly from the S corporation, HCI, to the shareholders, petitioners. Petitioners contend that this renders the economic outlay doctrine inapplicable.  But we have held that

> In order to increase basis in an S corporation, the shareholder must make an actual economic outlay; to satisfy this requirement, even in circumstances where the taxpayer purports to have made a direct loan to the S corporation, the taxpayer must show that the claimed increase in basis was based on "some transaction which when fully consummated left the taxpayer poorer in a material sense."  * * *  [Kaplan v. Commissioner, supra, and cases cited therein; citations and some quotation marks omitted.]

The issue is thus whether petitioners made an economic outlay on the yearly loans to HCI.

We have previously held that transactions involving a brief, circular flow of funds (beginning and ending with the original lender) designed solely to generate bases in an S corporation have no economic substance and therefore do not evidence the

required economic outlay. <u>Oren v. Commissioner</u>, T.C. Memo. 2002-172, affd. 357 F.3d 854 (8th Cir. 2004). In <u>Oren</u>, the taxpayers engaged in a circular loan transaction in an attempt to claim depreciation deductions otherwise in excess of bases in their S corporations. Starting from the taxpayers' other S corporation, loans of identical or almost identical amounts of money circled around to the taxpayers, to the S corporations with the depreciation deductions, and then back to the first S corporation. In holding that no economic outlay had been made, we found that the economic positions of the parties had not changed and that the disbursements of loan proceeds were the equivalent of offsetting bookkeeping entries. We noted that the cashflow on the loan repayments confirmed the transactions' lack of economic substance because they too followed a circular route. The Court of Appeals for the Eighth Circuit relied on similar reasoning to affirm our decision.

We have reached this same conclusion even where a loan was not used at every step of the circular transaction. <u>Kaplan v. Commissioner</u>, <u>supra</u>. In <u>Kaplan</u>, the taxpayer lent proceeds of a bank loan to his S corporation. That corporation paid the proceeds over to another S corporation owned by the taxpayer, which then lent the money back to the taxpayer. Since the first S corporation had an account payable due to the second, the taxpayer argued that the transfer between the S corporations was

a repayment of debt and the entire transaction was therefore not a circular loan. Because this transfer was not a loan, the debts of the first S corporation and the taxpayer technically continued to exist, unlike those in Oren v. Commissioner, supra, since there was no opposing cycle of loan repayments to automatically extinguish those debts.

The taxpayer argued that he made an economic outlay because he bore the risk that the first S corporation would not be able to repay him. Nevertheless, we found an inherent lack of substance in the loans and held that the taxpayer made no economic outlay because the transactions' structure rendered any purported risk illusory. Neither of the wholly owned S corporations would ever act adversely to the taxpayer's interests, and even if they did, his bank debt was secured by the second S corporation's bank account into which the funds were deposited. That meant there was no significant risk that the bank would ever enforce payment against him in the event of a default. Thus, there was no real danger that he would have ever had to contribute his own money to repay the bank debt. The loans' lack of substance was confirmed when the taxpayer later merged the S corporations, causing the debts to and from the taxpayer to cancel out.

In the case before us there is the same circular flow of cash beginning and ending with HCA. Each year, HCA lent money to

petitioners.  Petitioners then lent the proceeds to HCI.  To complete the cycle, HCI paid rent to HCA.  Viewed in its entirety, the transaction lacked economic substance since the money wound up right where it started.  The fact that purely paper debts to two parties (HCA and petitioners) were accumulating is not enough to give the transaction substance.  See Kaplan v. Commissioner, supra.

Petitioners made no economic outlay because they were merely a conduit through which the money flowed and there was no real expectation that they would repay HCA.  Like the taxpayer in Kaplan v. Commissioner, supra, petitioners exercised complete control over both HCA and HCI, meaning neither would act in a manner adverse to petitioners' interests.  Furthermore, there was no significant risk that petitioners would themselves ever have to repay any portion of the HUD loan.  Petitioners were never primarily liable on the HUD loan.  The only circumstance in which HUD would have been able to collect from petitioners would have been in the event of HCA's bankruptcy.  This was a highly improbable scenario, as the conditions imposed by the HUD loan on HCA's ability to lend money to petitioners practically ensured that HCA could do so only when it was profitable.  The fact that only one repayment was ever made in 16 years further indicates the loans' lack of substance.

Petitioners cite several cases as examples of the Court's having purportedly found an actual economic outlay despite a circular flow of funds.  However, none of these cases actually dealt with that fact pattern; they involved loans made by a controlled entity directly to an S corporation also owned by the taxpayer.  Ruckriegel v. Commissioner, T.C. Memo. 2006-78; Yates v. Commissioner, T.C. Memo. 2001-280; Culnen v. Commissioner, T.C. Memo. 2000-139, revd. and remanded on another issue 28 Fed. Appx. 116 (3d Cir. 2002).  Even though in each case the money never actually passed through the taxpayer's hands, we treated the transaction as a back-to-back loan involving the taxpayer because the controlled entity had acted as the taxpayer's incorporated pocketbook, routinely paying off taxpayer's expenses on his behalf.[1]  The Court held that each taxpayer had made an economic outlay despite the fact that the money came from a related lender (i.e., the controlled entity).  In approving the back-to-back loan structure, the Court in Ruckriegel specifically distinguished the facts in that case from the circular loan transaction scenario found in Oren v. Commissioner, T.C. Memo. 2002-172, and noted that the transfers were made with the valid

---

[1]In Ruckriegel v. Commissioner, T.C. Memo. 2006-78, only the wire transfers passing through the taxpayers' hands on the way from their partnership to their S corporation created an accession to their basis in the latter.  No basis step-up was allowed for the direct interentity transfers as to which the paper trail was often out of sync with the borrowing and lending it purported to document.

purpose of providing the S corporation with working capital. Thus, the Court concluded that assuming such a valid purpose exists, taxpayers are generally free to arrange the transaction in a tax-minimizing fashion. Ruckriegel v. Commissioner, supra.

Moreover, the taxpayers in the Ruckriegel, Yates, and Culnen cases acted in a manner consistent with treatment of the transactions as back-to-back loans, recording the transaction as such on the parties' books and actually making repayments in accordance with the stated terms of the loans.

In the case before us, there is no back-to-back loan situation. Instead, there is a circular flow of funds. Thus, the cases petitioners cite offer them no dispositive support. Furthermore, even if we did not find the transaction to be circular, the transfers between petitioners and HCI were not truly loans, with petitioners reporting no interest income and HCI claiming no interest deductions. With the exception of HCI's single repayment of principal in 1993, none of the parties ever made any payments on the loans.

Petitioners also cite Gilday v. Commissioner, T.C. Memo. 1982-242, as a purportedly circular transaction case yet giving rise to basis in indebtedness. Gilday also discussed the treatment of a direct loan to a controlled S corporation as a back-to-back loan involving the shareholder but provides even weaker support for petitioners' position in that the lender there

was a bank. When funds come from an unrelated third party, the arm's-length transaction tends to ensure that repayment will be enforced. <u>Miller v. Commissioner</u>, T.C. Memo. 2006-125.

Here, the loan is from a related party, HCA. The fact that the funds are coming from a related lender does not necessarily invalidate the transaction as long as other factors clearly establish the economic validity of the transaction. <u>Bhatia v. Commissioner</u>, T.C. Memo. 1996-429. However, we are unpersuaded that petitioners would ever have to repay the loans from HCA.

For these reasons, we hold that petitioners did not make an economic outlay on the yearly loans and did not acquire basis in indebtedness in those amounts.

The parties stipulated that

Only the following adjustments are in dispute:

> A. The disallowance of net operating losses carried back from 2001 * * * previously allowed with respect to petitioners' 1996 and 1997 years, resulting in increases in taxable income for 1996 and 1997 in the respective amounts of $105,255.00 and $15,354.00.

> B. The determination that losses from Highland Court, Inc. should be suspended due to a lack of basis in stock and indebtedness, resulting in an increase in taxable income for 2001 in the amount of $130,905.

All other adjustments proposed in the statutory notices of deficiency on which this case is based, other than consequential computational adjustments, are conceded by the petitioners.

Notwithstanding the above stipulation, respondent asserts that a second issue to be decided is whether petitioners' bases in stock and indebtedness in HCI in an open year must be computed using previously deducted losses in excess of their basis in stock and indebtedness in years that are now closed.  This issue was also discussed in the TAM.  However, since petitioners do not challenge respondent's position on this issue, either in their petition or on brief, the issue is deemed moot.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we hold them to be without merit and/or irrelevant.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.