ROBERT AND KIMBERLY BROZ, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 21629–06.          Filed September 1, 2011.

Ps were shareholders in a wholly owned S corporation (S) engaged in providing wireless cellular service. S acquired wireless cellular licenses from the FCC and built networks to service the license areas. S never operated any on-air networks. Instead, P formed related holding companies to hold title to the licenses and equipment. Many issues raised questions of first impression because transactions were structured in this ever-changing technology industry. Our holdings on these issues include:

1. *Held*: Ps were not sufficiently at risk for sec. 465, I.R.C., purposes when stock of a related corporation was pledged.

2. *Held*, *further*, the mere grant of a license by the FCC is not sufficient for an activity to qualify as an active trade or business under sec. 197, I.R.C.

*Stephen M. Feldman* and *Eric T. Weiss*, for petitioners.

*Meso T. Hammoud*, *Elizabeth Rebecca Edberg*, and *Steven G. Cappellino*, for respondent.

KROUPA, *Judge*: Respondent determined over $16 million of deficiencies[1] in petitioners' Federal income tax for 1996, 1998, 1999, 2000 and 2001 (years at issue). Respondent also determined that petitioners were liable for accuracy-related penalties of $563,042 for 1998, $386,489 for 1999, and $591,213 for 2000.

After concessions,[2] we are asked to decide several issues, many of which present questions of first impression as they relate to the ever-evolving cellular phone industry. We must

---

[1] Respondent determined a $100,003 deficiency for 1996, a $4,671,608 deficiency for 1998, a $3,385,533 deficiency for 1999, a $4,954,056 deficiency for 2000, and $3,395,214 for 2001.

[2] Petitioners concede that the amortization period for the license acquired as part of the Michigan 2 acquisition should be 15 years and that the Schedule M–1 adjustment should be disallowed. Respondent concedes a sec. 1231 adjustment and all penalties set forth in the deficiency notice. Respondent also concedes that petitioners are entitled to recapture for 1998 $3,548,365 of losses Alpine claimed in earlier years.

first decide a procedural issue, whether respondent is bound by equitable estoppel to a settlement offer made and subsequently withdrawn by respondent's Appeals Office before the deficiency notice was issued. We find that respondent is not bound by the settlement offer. Second, we must decide whether petitioners properly allocated $2.5 million of the $7.2 million purchase price to depreciable equipment when the allocation in the purchase agreement remained unchanged despite a 2-year delay in closing the transaction. We find that petitioners' allocation was improper. Third, we must determine whether petitioners had sufficient debt basis under section 1366 in stock of Alpine PCS, Inc. (Alpine), an S corporation, to claim flowthrough losses. We find that petitioners had insufficient debt basis and therefore cannot claim the flowthrough losses. Fourth, we must determine whether petitioners were at risk under section 465[3] and can therefore claim flowthrough losses from Alpine and related holding companies. We must decide whether petitioners' pledge of stock in a related S corporation is excluded from the at-risk amount because it was "property used in the business." This issue presents a question of first impression. We find that petitioners were not sufficiently at risk and therefore cannot claim the flowthrough losses because the stock they pledged was related to the business. Fifth, we must decide whether Alpine and Alpine PCS-Operating, LLC (Alpine Operating), an equipment holding company, were engaged in an active trade or business permitting them to deduct business expenses. We find that neither entity was engaged in an active trade or business and therefore may not deduct the expenses. Finally, we must decide whether the related license holding companies are entitled to amortization deductions for cellular licenses from the FCC upon the grant of the license or upon commencement of an active trade or business. This issue presents a question of first impression. We hold that they are not entitled to any amortization deductions upon the license grant because they were not engaged in an active trade or business during the years at issue.

---

[3] All section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate the stipulation of facts and the accompanying exhibits by this reference. Petitioners resided in Gaylord, Michigan, at the time they filed the petition.

## I. *RFB Cellular, Inc. (RFB)*

Robert Broz (petitioner) began his career as a banker before becoming involved with the cellular phone industry. He was president of Cellular Information Systems (CIS), a cellular company, for approximately seven or eight years in the 1980s.

Petitioner decided to invest personally in the development of cellular networks in rural statistical areas (RSAs) in the 1990s. Most large cellular service providers, like CIS, were focused on developing cellular networks in major statistical areas (MSA) and were less interested in RSA networks. The FCC began offering RSA licenses by lottery to any interested person to encourage development of cellular networks in rural areas. The RSA lotteries attracted an average of 500 participants nationwide.

Petitioner participated in approximately 400 lotteries for RSAs across the country. He won and purchased an RSA license for Northern Michigan (the Michigan 4 license) in 1991.

### A. *The Organization of RFB*

Petitioner organized RFB Cellular, Inc. (RFB), an S corporation, in 1991, the year he acquired the license. He contributed the Michigan 4 license and received in exchange 100 percent of RFB's issued and outstanding stock. Petitioner did not contribute any other money or property, nor did he make any loans to RFB from its inception through 2001. Petitioner was CEO of RFB and his brother, James Broz, served as CFO. Petitioner wife was involved in marketing.

RFB received between $4 and $4.2 million in vendor financing from Motorola to cover startup expenses. Approximately two-thirds of the financing went to construct and install the cellular equipment. When Motorola constructed and installed the equipment, petitioner began operating the network and used the remaining funds for working capital.

The Michigan 4 license that petitioner contributed to RFB serviced the northern portion of the lower Michigan peninsula by providing analog cellular service during the years at issue. RFB acquired a second license, the Michigan 2 license, which serviced the eastern upper Michigan peninsula. Most of RFB's revenue came from roaming charges for the use of two networks in Michigan. RFB also sold cellular phones to people to generate airtime.

RFB made $241,500 of cash distributions to petitioner in 1996, $613,673 in 2000 and $342,455 in 2001. RFB made Federal income tax payments on petitioners' behalf in 1995 and 1996. These tax payments were reflected as shareholder loans on RFB's tax returns. No promissory notes were issued for the tax payments RFB made on petitioners' behalf.

### B. *The Michigan 2 Acquisition*

RFB entered into a purchase agreement with Mackinac Cellular to acquire the Michigan 2 license and related equipment in 1994 (1994 purchase agreement). Mackinac Cellular had paid $1.6 million for the equipment in 1994. RFB arranged to purchase the license and equipment by issuing promissory notes and assuming debt.

The Michigan 2 acquisition by RFB was stalled for two years. It was stalled for various reasons but primarily because of a lawsuit petitioner's former employer, CIS, filed against petitioner for usurpation of a corporate opportunity. The license and equipment were transferred to Pebbles Cellular Corporation (Pebbles), a wholly owned subsidiary of CIS, through the negotiations. Pebbles did not change or improve the equipment during these two intervening years. Pebbles sold the Michigan 2 assets to RFB.

RFB and Pebbles entered into a purchase agreement in 1996 (1996 purchase agreement) after the lawsuit was resolved. The parties again undertook a series of negotiations and made some adjustments to the transaction. Nevertheless, the purchase price and the allocations in the 1996 purchase agreement were the same as those in the 1994 agreement. Both purchase agreements allocated $2.5 million of the $7.2 million purchase price to the equipment. Approximately $909,000 of the purchase price was allocated to costs

incurred by Pebbles between 1994 and 1996. Yet there was no allocation for these costs.

## II. *The Alpine Entities*

Petitioners sought to expand RFB's existing cellular business to new license areas. RFB's lenders agreed to fund the expansion. The lenders required, however, that RFB form a new entity to isolate the liabilities to the thinly capitalized new business entities RFB would form to hold title only to the licenses. Petitioners formed various entities (the Alpine entities) to further this expansion.

### A. *Alpine*

Petitioners organized Alpine, an S corporation, to bid on FCC licenses in RSA lotteries and to construct and operate digital networks to service the new license areas. Petitioner held a 99-percent interest in Alpine and his brother held the remaining one percent.

Alpine bid on licenses for geographic areas with demographics similar to those of RFB's existing network areas, and Alpine bid on licenses for areas in Michigan where RFB was already providing analog service. The FCC financed the purchase of most of the licenses Alpine won at auction. The FCC required, however, as a condition for financing, that the license holder make services available to at least 25 percent of the population in the geographic license area within five years of the grant (build out requirement). The FCC licenses were issued for a period of ten years from the date of the grant. RFB and commercial lenders funded the bidding and constructed and operated the new networks.

### B. *The Alpine License Holding Entities*

Alpine successfully bid on 12 licenses during the years at issue. Alpine made downpayments on the licenses and issued notes payable to the FCC for the balance of the purchase prices. Alpine then transferred the licenses to various single-member limited liability companies (collectively, the license holding companies) formed to hold the licenses and lease them to Alpine.[4] Petitioner held a 99-percent interest in each

---

[4] The Alpine license holding entities were Alpine-California F, LLC, Alpine Michigan F, LLC, Alpine Hyannis F, LLC and Alpine Fresno C, LLC.

license holding entity and his brother owned the remaining one percent. Each Alpine license holding entity assumed the FCC debt in exchange for receiving the license. Alpine continued to make payments on the FCC debt even after the licenses were transferred to the Alpine license holding entities. Alpine maintained the books and records of Alpine, the Alpine entities and the Alpine license holding entities.

No Alpine entities operated any on-air networks during the years at issue. RFB operated the only on-air networks. RFB used Alpine's licenses to provide digital service in geographic areas RFB's analog licenses already covered. RFB provided digital service by adding digital equipment onto RFB's existing cellular towers. RFB owned the equipment that serviced the Michigan licenses. RFB allocated income and expenses related to the licenses to Alpine.

No Alpine license holding entities met the FCC's build out requirements for any of its licenses. Consequently, the FCC canceled two of the three licenses Alpine retained. Alpine returned the third license to the FCC and forfeited its $900,000 initial downpayment.

The only income Alpine reported was income that RFB had allocated to Alpine from RFB's use of Alpine's licenses. Alpine did not report income during any of the other years at issue. Alpine claimed depreciation deductions[5] and other deductions.[6] Alpine deducted interest on debt owed to the FCC. Alpine also deducted interest on debt owed to RFB, even though Alpine never made any interest payments. Alpine amortized and deducted expenses for alleged startup costs[7] even though Alpine had not made a formal election under section 195(b).

The only income any of the Alpine license holding entities reported was income allocated to them from RFB's use of the licenses. The Alpine license holding entities each claimed amortization deductions related to the licenses and deducted interest paid on amounts borrowed from a related entity to service the FCC debt.

---

[5] The depreciation deductions were for leasehold improvements for a California office, furniture, fixtures, computers and vehicles.

[6] The other deductions were for expenses such as salaries, office expenses, telephone and utilities, rent, insurance, and dues and subscriptions.

[7] Such expenses included consulting expenses, travel and entertainment expenses, salaries, rent, legal fees, relocation expenses, contract labor, fringe benefits, and miscellaneous expenses.

Alpine and the license holding entities ceased all business activities by the end of 2002.

## C. *Alpine Operating and Alpine Investments, LLC*

Petitioner formed Alpine Operating, a single-member limited liability company, to hold the digital equipment and lease it to Alpine. Petitioner wholly owned Alpine Operating, a disregarded entity for Federal income tax purposes. Alpine Operating reported no income and did not claim any depreciation deductions for the equipment during the years at issue. Alpine Operating claimed interest and automobile depreciation deductions for 1999 and 2000.

Petitioner formed Alpine Investments, LLC (Alpine Investments), a single-member limited liability company, to serve as an intermediary for transferring money to the Alpine entities. Petitioner's tax advisers advised petitioner that he needed to increase his bases in the Alpine entities. Additionally, CoBank prohibited the distribution of loan proceeds to an individual. Petitioner wholly owned Alpine Investments, a disregarded entity.

## III. *The CoBank Loans*

CoBank was the main commercial lender to RFB and the Alpine entities during the years at issue. RFB used CoBank loan proceeds to expand its existing business through Alpine and the related entities. CoBank specifically acknowledged that RFB would advance the proceeds directly or indirectly to the Alpine entities. Alpine allocated some of the funds to other Alpine entities.

RFB refinanced the CoBank loan several times. Petitioner pledged his RFB stock as additional security but he never personally guaranteed the CoBank loan. The loan was secured by the assets of the Alpine license holding entities. Several of the Alpine entities also guaranteed the loan.

RFB recorded the advances on its general ledger as "advances to Alpine PCS."[8] Alpine recorded the same advances as "notes payable." Some of the advances to Alpine were allocated to other Alpine entities, which recorded the allocations as advances or "notes payable" on the general ledgers. RFB, Alpine and the other Alpine entities made year-

---

[8] RFB initially recorded the advances in its books as "other assets".

end adjusting entries reclassifying the advances as loans from a shareholder. Alpine reflected the advances as long-term liabilities on the returns for the years at issue.

Promissory notes were executed between petitioner and RFB, and between petitioner and Alpine, to reflect accrued but unpaid interest on the purported loans. RFB indicated in financial statements for the years at issue that it would not demand repayment of any of the advances. No security was provided with respect to the promissory notes. No cash payments of either principal or interest were ever made by any of the parties with respect to the promissory notes. Petitioner nevertheless reported interest income and income expense from the promissory notes on his individual returns.

Beginning in 1999, the advances from RFB were reclassified through yearend adjusting entries as loans from Alpine Investments. Alpine Investments assumed the promissory notes executed between petitioner and Alpine, and between petitioner and RFB. Alpine Investments executed promissory notes with the Alpine entities and RFB to document the purported loans.

## IV. *IRS Appeals Proceeding*

The Appeals case involved all five years at issue. Appeals Officer Thomas Dolce (Officer Dolce) was assigned to petitioners' case and negotiated with petitioners' attorney, Sean Cook (Mr. Cook). Petitioners, RFB and the Alpine license holding entities filed for bankruptcy protection in 2003. Petitioners' bankruptcy proceedings ran concurrently with their IRS Appeals case.

Officer Dolce and Mr. Cook exchanged several settlement offers over the course of the negotiations. Officer Dolce orally proposed a "sum certain settlement" (settlement offer) during a telephone conference in October 2005. The settlement offer made no changes to petitioners' tax liabilities for the years at issue but increased petitioners' tax liability for 2002, which was not under examination.

Petitioners accepted the settlement offer. Officer Dolce informed petitioners that he needed his manager's approval before the settlement could be finalized. He also advised Mr. Cook that the parties needed to draft a closing agreement to finalize the settlement. Mr. Cook provided Officer Dolce with

a draft closing agreement petitioners had reviewed, but Officer Dolce did not sign it. The parties did not enter into any written agreement regarding the settlement offer.

Officer Dolce orally informed petitioners that he had obtained the necessary approval but later learned that the offer exceeded the scope of his settlement authority. His authority extended to litigation risk, not collectibility. He made the settlement offer because he determined petitioners could not afford to pay the entire outstanding liability rather than on the merits of the case. Officer Dolce decided to withdraw the settlement offer when he learned the offer had yet to be finalized.

Officer Dolce informed Mr. Cook two weeks later that the offer was withdrawn. The parties waited to meet until December 2005 to discuss the withdrawal because they were in different areas of Michigan, not close to each other.

## V. *The Deficiency Notice*

Respondent issued petitioners the deficiency notice for the years at issue in 2006. Respondent determined that petitioners had insufficient debt basis in Alpine to claim flowthrough losses for the years at issue. Respondent also determined that petitioners were not at risk with respect to their investments in the Alpine license holding entities and Alpine Operating and were therefore not entitled to claim flowthrough losses.

Respondent determined that Alpine was not entitled to interest, depreciation, startup expense, and other deductions because it was not engaged in an active trade or business during those years. Respondent also determined that Alpine Operating was not entitled to deduct interest and depreciation because it was not engaged in an active trade or business. Respondent determined that the Alpine license holding entities amortization deductions for the licenses were disallowed because they were not engaged in an active trade or business at the relevant time.

Petitioners timely filed a petition.

## OPINION

We are asked to resolve the tax consequences of the ever-evolving cellular phone industry with rapidly changing tech-

nology. Several issues raise questions of first impression. These include whether in an S corporation there is a separate definition in the at-risk rules involving whether the shareholder's pledge of stock of a related corporation is excluded from the at-risk amount because it was property used in the business. We must also focus on when a cellular phone entity begins business for purposes of deducting beginning expenses and for amortization of the FCC license under section 197. Specifically, we must decide whether a cellular phone business begins upon the grant of the license from the FCC or when contracts for wireless services are sold. We address these substantive issues in turn.

## I. *The Settlement Offer*

We must first decide a procedural issue of whether respondent is bound to an oral settlement offer made and subsequently withdrawn by respondent's Appeals Office before the deficiency notice was issued. Petitioners argue that the oral settlement offer is enforceable, notwithstanding the lack of a written closing agreement, because Officer Dolce's supervisor approved the offer. They argue alternatively that respondent should be bound by equitable estoppel to the settlement offer because Officer Dolce recklessly withdrew the offer after petitioners had relied on it. Respondent denies that the oral settlement offer is enforceable because it was not memorialized in a written closing agreement. Respondent also argues that petitioners have not established the elements necessary for us to apply equitable estoppel. We address the parties' arguments in turn.

### A. *Enforceability of the Settlement Offer*

We begin with petitioners' argument that the oral settlement offer is an enforceable agreement. The compromise and settlement of tax cases is governed by general principles of contract law. *Dorchester Indus. Inc. v. Commissioner*, 108 T.C. 320, 330 (1997) affd. without published opinion 208 F.3d 205 (3d Cir. 2000). The law for administrative, or pre-petition, settlement offers is well established. See *Dormer v. Commissioner*, T.C. Memo. 2004–167; *Rohn v. Commissioner*, T.C. Memo. 1994–244. The procedures for closing agreements and compromises are set forth in section 7121 (relating to

closing agreements), section 7122 (relating to compromises) and the regulations thereunder. See secs. 7121 and 7122; secs. 301.7121–1, 301.7122–1, Proced. & Admin. Regs. These procedures are exclusive and must be satisfied for a compromise or settlement to be binding on both a taxpayer and the Commissioner. *Rohn v. Commissioner*, *supra*; see also *Urbano v. Commissioner*, 122 T.C. 384, 393 (2004). Negotiations with the IRS are enforceable only if they comply with the procedures. *Rohn v. Commissioner*, *supra*. A settlement offer must be submitted on one of two special forms the Commissioner prescribes. *Id.*; sec. 301.7122–1(d)(1), (3), Proced. & Admin. Regs. Form 866, Agreement as to Final Determination of Tax Liability, is a type of closing agreement that is to be a final determination of a taxpayer's liability for a past taxable year or years. Form 906, Closing Agreement on Final Determination Covering Specific Matters, is a second type of closing agreement that finally determines one or more separate items affecting the taxpayer's liability. The parties never put the sum certain settlement in writing, let alone on one of the prescribed forms. Officer Dolce's oral settlement offer is therefore not legally enforceable.

B. *Equitable Enforcement of the Settlement Offer*

We now address whether equity principles nonetheless require us to enforce the settlement offer. Equitable estoppel is a judicial doctrine that requires finding the taxpayer relied on the Government's representations and suffered a detriment because of that reliance. Estoppel precludes the IRS from denying its own representations if those representations induced the taxpayer to act to his or her detriment. *Hofstetter v. Commissioner*, 98 T.C. 695, 700 (1992). The doctrine of equitable estoppel is applied against the Government with utmost caution and restraint. *Boulez v. Commissioner*, 810 F.2d 209, 218 (D.C. Cir. 1987), affg. 76 T.C. 209 (1981); *Kronish v. Commissioner*, 90 T.C. 684, 695 (1988).

The Court of Appeals for the Sixth Circuit, to which this case is appealable, requires a litigant to establish affirmative misconduct on the Government's part as a threshold to proving estoppel. See *United States v. Guy*, 978 F.2d 934, 937 (6th Cir. 1992). Affirmative misconduct is more than mere negligence. *Id.* It requires an affirmative act by the Govern-

ment to either intentionally or recklessly mislead the taxpayer. *Mich. Express, Inc. v. United States*, 374 F.3d 424, 427 (6th Cir. 2004). The taxpayer must also prove the traditional three elements of estoppel. These three traditional elements include (1) a misrepresentation by Government; (2) reasonable reliance on that misrepresentation by the taxpayer; and (3) detriment to the taxpayer. See *Heckler v. Community Health Servs.*, 467 U.S. 51, 59 (1984).

Petitioners' equitable estoppel argument fails for several reasons. First and foremost, we find that petitioners failed to meet the threshold in the Sixth Circuit of showing any affirmative misconduct on respondent's part. They argue that Officer Dolce's failure to personally notify them for 40 days that the offer was withdrawn constituted "affirmatively reckless conduct." We disagree.

We find instead that the delay was due to the considerable geographical distance between Officer Dolce and petitioners rather than to any affirmative misconduct on the part of Officer Dolce. Moreover, even though Officer Dolce failed to notify petitioners in person for 40 days, Officer Dolce notified petitioners' counsel, Mr. Cook, within two weeks that the offer was withdrawn. We find that Officer Dolce's actions do not rise to the level of affirmative misconduct.

Additionally, petitioners have failed to prove the traditional elements of equitable estoppel. Petitioners have failed to establish that Officer Dolce made any misrepresentations to them regarding the settlement offer. Officer Dolce made a conditional settlement offer to petitioners that needed to be approved by Officer Dolce's supervisor. He withdrew the offer, which had yet to be finalized, upon realizing that a sum certain settlement was beyond his authority. Officer Dolce notified petitioners that the offer was withdrawn. He also explained to petitioners his reasons for withdrawing the offer.

Petitioners' reliance, if any, on the oral settlement offer was unreasonable. Petitioners knew that the settlement offer was not final until they entered into a written closing agreement. They discussed the need for a written closing agreement with Mr. Dolce and reviewed a draft closing agreement Mr. Cook prepared.

Finally, respondent did not induce petitioners to take any adverse action. Petitioners claim they conceded certain rights

in the bankrupcy proceeding in reliance on the oral settlement offer. Petitioners have not established what rights, if any, they conceded attributable to the bankrupcy proceeding.

Accordingly, we conclude that equitable estoppel principles do not require respondent to be bound by the sum certain settlement offer.

## II. *Valuation of the Michigan 2 Acquisition*

Next, we must determine whether petitioners properly allocated $2.5 million of the $7.2 million Michigan 2 purchase price to equipment for depreciation purposes. Petitioners relied on the allocations made in the Michigan 2 purchase agreement even though there was a 2-year delay in acquiring the equipment and license.

RFB acquired both depreciable and nondepreciable property when it paid $7.2 million to acquire the cellular phone equipment and license from Pebbles, the seller. When a combination of depreciable and nondepreciable property is purchased for a lump sum, the lump sum must be apportioned between the two types of property to determine their respective costs. The cost of the depreciable property is used to determine the amount of the depreciation deduction. The relevant inquiry is the respective fair market values of the depreciable and nondepreciable property at the time of acquisition. *Weis v. Commissioner*, 94 T.C. 473, 482–483 (1990); *Randolph Bldg. Corp. v. Commissioner*, 67 T.C. 804, 807 (1977). Petitioners bear the burden of proving that respondent's allocation is incorrect. See Rule 142(a); see *Elliott v. Commissioner*, 40 T.C. 304, 313 (1963).

Petitioners contend that the $2.5 million allocation to depreciable assets is proper. They first argue it is proper because it is the amount the parties agreed to in the 1994 and 1996 purchase agreements.[9] An allocation in a purchase agreement is not necessarily determinative, however, if it fails to reflect a bargained-for amount. See *Sleiman v. Commissioner*, 187 F.3d 1352, 1361 (11th Cir. 1999), affg.

---

[9] Petitioners also rely on the Michigan 4 acquisition as best evidence of the value of the Michigan 2 equipment. Petitioners estimated the value of the Michigan 4 equipment using only the costs they incurred and the vendor financing they received. They have not provided sufficient evidence of the equipment's value. Moreover, petitioners have not established that the Michigan 4 equipment is comparable to the Michigan 2 equipment.

T.C. Memo. 1997–530. Petitioners further argue that the $2.5 million allocation to depreciable assets is proper because it represents the cost they would have to pay to replace the wireless cellular equipment. Petitioners have not provided any evidence beyond their own self-serving testimony to substantiate the replacement cost. We need not accept the taxpayer's self-serving testimony when the taxpayer fails to present corroborative evidence. *Beam v. Commissioner*, T.C. Memo. 1990–304 (citing *Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986)), affd. without published opinion 956 F.2d 1166 (9th Cir. 1992).

Moreover, we find it implausible that the equipment had a value of $2.5 million at the time RFB acquired it from Pebbles. Mackinac's original purchase of the Michigan 2 equipment for $1.6 million in 1994 indicates that the equipment was worth, at most, only $1.6 million when RFB purchased it in 1996. See *Estate of Cartwright v. Commissioner*, T.C. Memo. 1996–286. Moreover, petitioners testified that the equipment was rapidly depreciating on account of advancing cellular technology. In fact, some of the Michigan 2 equipment became obsolete between 1994 and 1996 and had to be decommissioned after RFB's acquisition. Nevertheless, the allocation amount remained unchanged between the 1994 and 1996 purchase agreements. Petitioners have not shown that they made any additions or improvements to explain why the allocation amount remained unchanged over the 2-year period. We accordingly find that petitioners' allocation of $2.5 million to equipment was improper and instead sustain respondent's determination that $1.5 million be allocated to the equipment.

III. *Basis Limitations on Flowthrough Losses*

We now turn to basis in Alpine. We must determine whether petitioners, shareholders of Alpine, an S corporation, had sufficient debt basis to claim flowthrough losses during the years at issue. Petitioners argue that the payments petitioner made to Alpine with the loan proceeds from CoBank gave them basis in Alpine. Respondent contends that the payments did not create basis. Instead, petitioners served as a mere conduit to the transfer of loan proceeds from RFB to Alpine. Respondent further asserts that petitioners did not

make any economic outlay that would entitle them to increase their basis in the S corporation.

A. *Basis to S Corporation Shareholder*

First, we state the general rules governing when a shareholder in an S corporation is entitled to deduct losses the S corporation sustained. A shareholder of an S corporation can directly deduct his or her share of entity-level losses in accordance with the flowthrough rules of subchapter S. See sec. 1366(a). The losses cannot exceed the sum of the shareholder's adjusted basis in his or her stock and the shareholder's adjusted basis in any indebtedness of the S corporation to the shareholder. Sec. 1366(d)(1)(A) and (B). This restriction applies because the disallowed amount exceeds the shareholder's economic investment in the S corporation and, because of the limited liability accorded to S corporations, the amount does not have to be repaid. The shareholder bears the burden of establishing his or her basis. *Estate of Bean v. Commissioner*, 268 F.3d 553, 557 (8th Cir. 2001), affg. T.C. Memo. 2000–355; *Parrish v. Commissioner*, 168 F.3d 1098, 1102 (8th Cir. 1999), affg. T.C. Memo. 1997–474.

A shareholder who makes a loan to an S corporation generally acquires debt basis if the shareholder makes an economic outlay for the loan. The indebtedness must run directly from the S corporation to the shareholder and the shareholder must make an actual economic outlay for debt basis to arise. *Kerzner v. Commissioner*, T.C. Memo. 2009–76. When the taxpayer claims debt basis through payments made by an entity related to the taxpayer and then from the taxpayer to the S corporation (back-to-back loans), the taxpayer must prove that the related entity was acting on behalf of the taxpayer and that the taxpayer was the actual lender to the S corporation. *Ruckriegel v. Commissioner*, T.C. Memo. 2006–78. If the taxpayer is a mere conduit and if the transfer of funds was in substance a loan from the related entity to the S corporation, the Court will apply the step transaction doctrine and ignore the taxpayer's participation. *Id.*

A taxpayer makes an economic outlay for purposes of debt basis when he or she incurs a "cost" on a loan or is left poorer in a material sense after the transaction. *Putnam v.*

*Commissioner*, 352 U.S. 82 (1956); *Estate of Bean v. Commissioner*, *supra* at 558; *Bergman v. United States*, 174 F.3d 928, 930 n.6 (8th Cir. 1999); *Estate of Leavitt v. Commissioner*, 875 F.2d 420, 422 (4th Cir. 1989), affg. 90 T.C. 206 (1988). The taxpayer may fund the loan to the S corporation with money borrowed from a third-party lender in a back-to-back loan arrangement. *Underwood v. Commissioner*, 535 F.2d 309, 312 n.2 (5th Cir. 1976), affg. 63 T.C. 468 (1975); *Hitchins v. Commissioner*, 103 T.C. 711, 718 & n.8 (1994); *Raynor v. Commissioner*, 50 T.C. 762, 771 (1968). The taxpayer has not made an economic outlay, however, if the lender is a related party and if repayment of the funds is uncertain. See, e.g., *Oren v. Commissioner*, 357 F.3d 854 (8th Cir. 2004), affg. T.C. Memo. 2002–172; *Underwood v. Commissioner*, *supra* at 312.

### B. *Direct Loan From RFB*

Against this background, we now address whether petitioner acquired basis in Alpine in the amount of the loan. Petitioners claim they advanced the CoBank loan proceeds to the Alpine entities as part of a back-to-back loan arrangement.[10] Petitioners have not established that they lent, rather than advanced, the CoBank loan proceeds to Alpine. See *Yates v. Commissioner*, T.C. Memo. 2001–280; *Culnen v. Commissioner*, T.C. Memo. 2000–139, revd. and remanded 28 Fed. Appx. 116 (3d Cir. 2002). Petitioner never substituted himself as "lender" in the place of RFB. There is no evidence that the Alpine entities were indebted to petitioner rather than to RFB. Interest on the unsecured notes accrued and was added to the outstanding loan balances. No payments were ever made. Moreover, petitioners signed the promissory notes on behalf of all the entities, making it unlikely that any of the entities would seek payment from petitioners. See *Oren v. Commissioner*, *supra* at 859. The promissory notes, therefore, do not establish bona fide indebtedness between petitioners and Alpine.

Moreover, the payments petitioners made to Alpine from the CoBank loan proceeds were characterized as advances, rather than loan distributions, at the time the payments

---

[10] Petitioners substituted themselves for Alpine Investments, a disregarded entity they wholly owned, beginning in 1999.

were made. See *Ruckriegel v. Commissioner*, *supra*. The payments were recharacterized as loans only through yearend reclassifying journal entries and other documents. The loan ran from RFB to the Alpine entities, and petitioners served as a mere conduit for the funds. Accordingly, we find that the Alpine entities were not directly indebted to petitioners.

Petitioners also have not shown that RFB made the payments to Alpine on petitioners' behalf. We have found that direct payments from a related entity to the taxpayer's S corporation constituted payments on the taxpayer's behalf where the taxpayer used the related entity as an "incorporated pocketbook." See *Yates v. Commissioner*, *supra*; *Culnen v. Commissioner*, *supra*. The term "incorporated pocketbook" refers to the taxpayer's habitual practice of having his wholly owned corporation pay money to third parties on his behalf. See *Ruckriegel v. Commissioner*, *supra*. Whether an entity is an incorporated pocketbook is a question of fact. *Id.* Petitioners have not established that RFB habitually or routinely paid petitioners' expenses so as to make RFB an incorporated pocketbook.

C. *Economic Outlay*

We now turn to the economic outlay requirement. Petitioners also contend that their pledge of RFB stock as collateral for the CoBank loan constituted an economic outlay justifying an increase in petitioners' basis in their Alpine entities. A pledge of personal assets is insufficient to create basis until and unless the shareholder pays all or part of the obligation that the shareholder guaranteed. See *Estate of Leavitt v. Commissioner*, *supra* at 423; *Maloof v. Commissioner*, T.C. Memo. 2005–75, affd. 456 F.3d 645 (6th Cir. 2006). Petitioners have not shown that they incurred any cost with regard to their pledge of RFB stock.

Moreover, petitioners have not shown that they incurred a cost with respect to the loan or were otherwise left poorer in a material sense.[11] See *Maloof v. Commissioner*, *supra*. Peti-

_____

[11] Petitioners contend that they suffered actual economic loss with respect to the pledge of stock when the banks obtained RFB's assets in the bankruptcy proceedings. The bankruptcy case was settled after the years at issue, however, and is therefore irrelevant for purposes of determining economic outlay at the time the payments were made. Petitioners also argue that they were left "poorer in a material sense" by RFB's use of undistributed after-tax profits for advances to the Alpine entities. Petitioners' argument is irrelevant because we have determined that RFB was not an "incorporated pocketbook" for petitioners. Cf. *Yates v. Commissioner*, T.C.

tioners never personally guaranteed or were otherwise personally liable on the CoBank loan. See *id.* Petitioners signed the promissory notes on behalf of all the entities, making it unlikely that any of the entities would seek payment from petitioners. See *Oren v. Commissioner*, *supra* at 859. Furthermore, RFB indicated in its financial statements that it would not demand repayment on any advances made to petitioners.

We therefore will apply the step transaction doctrine and ignore petitioners' participation in the advances from RFB to Alpine. We find that petitioners had insufficient debt basis in Alpine to claim flowthrough losses during the years at issue.

## IV. *At-Risk Limitation on Flowthrough Losses*

We now focus on whether petitioners were at risk with respect to Alpine, Alpine Operating and the Alpine license holding entities because of the unique way the transactions were structured. We must decide for the first time whether stock in a related S corporation is property used in the business to preclude petitioners from being at risk for any pledge of property used in the business.

We begin with an overview of the at-risk rules. The at-risk rules ensure that a taxpayer deducts losses only to the extent he or she is economically or actually at risk for the investment. Sec. 465(a); *Follender v. Commissioner*, 89 T.C. 943 (1987). The amount at risk includes cash contributions and certain amounts borrowed with respect to the activity for which the taxpayer is personally liable for repayment. Sec. 465(b)(2)(A). Pledges of personal property as security for borrowed amounts are also included in the at-risk amount. Sec. 465(b)(2)(B). The taxpayer is not at risk, however, for any pledge of property used in the business. *Id.*

The parties disagree whether the RFB stock petitioners pledged constitutes property used in the business. Petitioners contend that RFB stock is not property used in the business for at-risk purposes because the stock represents an ownership interest in the business that can be sold or transferred without affecting corporate assets. According to petitioners, stock is therefore inherently separate and distinct from the

Memo. 2001–280; *Culnen v. Commissioner*, T.C. Memo. 2000–139, revd. and remanded 28 Fed. Appx. 116 (3d Cir. 2002).

activities of a corporation and the pledge of stock of the related corporation should allow petitioners to be treated as at risk. We disagree.

We reject petitioners' narrow interpretation of property used in the business. Pledged property must be "unrelated to the business" if it is to be included in the taxpayer's at-risk amount. See sec. 465(b)(2)(A) and (B); *Krause v. Commissioner*, 92 T.C. 1003, 1016–1017 (1989), affd. sub nom. *Hildebrand v. Commissioner*, 28 F.3d 1024 (10th Cir. 1994); *Miller v. Commissioner*, T.C. Memo. 2006–125.[12] The Alpine entities were formed by petitioner to expand RFB's existing cellular networks. RFB also used some of Alpine's digital licenses to provide digital service to RFB's analog network areas. RFB then allocated income from the licenses back to Alpine. The RFB stock is related to the Alpine entities. Cf. sec. 1.465–25(b)(1)(i), Proposed Income Tax Regs., 44 Fed. Reg. 32244 (June 5, 1979).

Moreover, even if the RFB stock is unrelated to the cellular phone business, petitioners were not economically or actually at risk with respect to their involvement with the Alpine entities. Petitioners contend that petitioner was the obligor of last resort on the CoBank loan. Petitioners were not actually at risk because they never personally guaranteed the CoBank loan, nor were they ever personally liable on the purported loans to the Alpine entities. Additionally, petitioners were not economically at risk. We have held that where the transaction has been structured so as to remove any realistic possibility of loss, the taxpayer is not at risk for the borrowed amounts. See *Oren v. Commissioner*, 357 F.3d at 859; *Levien v. Commissioner*, 103 T.C. 120, 126 (1994), affd. without published opinion 77 F.3d 497 (11th Cir. 1996). We have already determined that the structured transaction made it highly unlikely that petitioners would experience a loss.

We find that petitioners' pledge of RFB stock did not put them at risk in Alpine and the other Alpine entities to allow them passthrough losses.

---

[12] Furthermore, the flush language of sec. 465(b)(2) provides that no property shall be taken into account as security for borrowed amounts if such property is directly or indirectly financed by indebtedness which is secured by the property. The RFB stock qualifies as "property * * * directly or indirectly financed by indebtedness" because RFB borrowed the funds from CoBank. Petitioners' pledge of RFB stock therefore cannot be taken into account to determine whether petitioners were at risk.

## V. *Business and Startup Expenses*

### A. *Business Expenses*

We now must decide whether Alpine and Alpine Operating were engaged in an active trade or business for purposes of deducting certain expenses. Alpine and Alpine Operating deducted interest, depreciation, startup and certain other business expenses (beginning expenses). Respondent argues that none of the Alpine entities are entitled to deductions for the beginning expenses because they were not involved in an active trade or business during the years at issue. Petitioners contend that the Alpine entities acquired licenses and related equipment to expand RFB's existing cellular business and are therefore entitled to the deductions for the beginning expenses. We begin with the general rules for deducting business expenses.

Taxpayers may deduct ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Sec. 162(a). The taxpayer is not entitled to deduct expenses incurred before actual business operations commence and the activities for which the trade or business was formed are performed. *Johnsen v. Commissioner*, 83 T.C. 103, 114 (1984), revd. 794 F.2d 1157 (6th Cir. 1986). Whether the taxpayer is actively carrying on a trade or business depends on the facts and circumstances. *Commissioner v. Groetzinger*, 480 U.S. 23, 36 (1987). A taxpayer is not engaged in a trade or business even if he has made a firm decision to enter into business and over a considerable period of time spent money in preparing to enter that business. *Richmond Television Corp. v. United States*, 345 F.2d 901, 907 (4th Cir. 1965). The taxpayer is not engaged in any trade or business until the business has begun to function as a going concern and has performed the activities for which it was organized. *Id.*

The determination of whether an entity is actively engaged in a trade or business must be made by viewing the entity in a stand-alone capacity and not in conjunction with other entities. See *Bennett Paper Corp. & Subs. v. Commissioner*, 78 T.C. 458, 463–465 (1982), affd. 699 F.2d 450 (8th Cir. 1983). RFB's business therefore cannot be attributed to Alpine and Alpine Operating. Instead, we must examine the Alpine

entities individually to determine whether they were engaged in a trade or business during the years at issue. We begin with Alpine.

Petitioners organized Alpine to obtain FCC licenses and to construct and operate networks to service the new license areas. Petitioners claim that Alpine had two on-air networks in September 2001. Petitioners failed to provide any evidence beyond petitioner's own self-serving testimony to substantiate this claim, however. Instead, the record reflects that the on-air networks were operated by RFB rather than Alpine. RFB used Alpine's Michigan licenses and allocated any income earned from the licenses to Alpine or the Alpine license holding entities.[13] Petitioners failed to establish here that Alpine was engaged in an active trade or business during the years at issue, and it is not entitled to any deductions for beginning expenses.

We now turn to Alpine Operating. Alpine Operating was formed for the sole purpose of serving Alpine's business and depended on Alpine for revenue. We have already determined that petitioners failed to establish that Alpine was engaged in an active trade or business during the years at issue. We therefore find, by extension, that Alpine Operating was not engaged in an active trade or business and is not entitled to deduct any beginning expenses.

B. *Startup Expenses*

Petitioners alternatively argue that they are entitled to amortize and deduct the beginning expenses as startup expenses. Taxpayers are entitled to amortize and deduct startup expenses only if they attach a statement to the return for the taxable year in which the trade or business begins. See sec. 195(b)(1), (c). Petitioners did not file the appropriate statement with their returns and are only now electing to amortize and deduct the expenses. We find therefore that they are ineligible to amortize and deduct the beginning expenses.

---

[13] We find compelling that Alpine did not meet the FCC's build out requirement to make service available to at least 25 percent of the population in any license areas within five years of the grant. The FCC canceled two of the three licenses Alpine retained, and Alpine returned the third license to the FCC and forfeited the downpayment.

## VI. *Amortization of the FCC Licenses*

We now turn to amortization of the FCC licenses. The parties agree that the licenses are amortizable but disagree on when amortization should begin. Their dispute is based on their different interpretations of section 197. Respondent contends that the licenses are amortizable upon commencement of a trade or business. Petitioners argue that the licenses are amortizable upon acquisition. We must decide for the first time whether section 197 requires that the taxpayer be engaged in a trade or business to claim amortization deductions. If we determine that section 197 imposes a trade or business requirement, we must also determine the extent of that requirement. We begin with the general rules for amortizing intangibles.

Intangibles were amortized and depreciated under section 167 before the enactment of section 197. Sec. 1.167(a)–3, Income Tax Regs. Taxpayers could claim depreciation deductions for intangible property used in a trade or business or held for the production of income if the property had a useful life that was limited and reasonably determinable. *Id.* There was some uncertainty, however, over what constituted an amortizable intangible asset and the proper method and period for depreciation. See Omnibus Budget Reconciliation Act of 1993, Pub. L. 103–66, sec. 13261, 107 Stat. 532.

Congress enacted section 197 to resolve some of the uncertainty surrounding the regulation. H. Rept. 103–111, at 777 (1993), 1993–3 C.B. 167, 353. An "amortizable intangible" is now defined as an intangible acquired by and held in connection with the conduct of a trade or business. Sec. 197(c)(1). Such intangibles include "any license, permit or other right granted by a governmental unit or an agency or instrumentality thereof" that is held in connection with the conduct of a trade or business. See sec. 197(c)(1)(B), (d)(1)(D). The cost of the intangible is amortizable over a fixed 15-year period. Sec. 197(a).

Petitioners contend that section 197 lacks a specific trade or business requirement. Thus, petitioners argue that they may begin amortizing the FCC licenses upon grant even though no trade or business has begun. They argue that the statute lacks a specific trade or business requirement because the phrase "trade or business" does not appear in

subsection (a), which provides the general rule. They argue that the plain meaning of the statute permits them to begin amortizing the licenses in the month of the license grant regardless of whether any business had begun.

We turn to the language of section 197. It is a central tenet of statutory construction that, when any provision of a statute is interpreted, the entire statute must be considered. See, e.g., *Lexecon Inc. v. Milberg Bershad Hynes & Lerach*, 523 U.S. 26, 36 (1998); *Huffman v. Commissioner*, 978 F.2d 1139, 1145 (9th Cir. 1992), affg. in part and revg. in part T.C. Memo. 1991–144. The phrase "trade or business" appears five times in section 197. An intangible is not amortizable under the general rule of subsection (a) unless it is an "amortizable section 197 intangible." See sec. 197(a). An amortizable section 197 intangible is defined as an intangible that is held "in connection with the conduct of a trade or business." See sec. 197(c)(1)(B). The statute requires that there be a trade or business for amortization purposes. Mere grant of an FCC license does not satisfy the requirement.

Moreover, to interpret section 197 as allowing amortization without regard to the taxpayer's trade or business ignores the purpose behind section 197. Section 197 was enacted to provide taxpayers acquiring intangible assets with a deduction similar to the depreciation deduction under section 167 for tangible assets. Taxpayers are allowed a depreciation deduction for property used in a trade or business. See sec. 167(a). There is no indication in the legislative history of section 197 that Congress intended to change depreciation principles established in section 167 to allow taxpayers to amortize intangible assets without regard to whether there was a trade or business.

We now must determine the nature of the section 197 trade or business requirement. Several Code sections impose an active trade or business requirement. For example, taxpayers are allowed to deduct business expenses incurred in carrying on a trade or business, sec. 162, depreciation expenses for tangible personal property used in a trade or business, sec. 167, and startup expenses for an "active trade or business", sec. 195. The taxpayer must be carrying on or engaged in a trade or business at the time of the expenditure to be eligible for the deduction. See *Weaver v. Commissioner*, T.C. Memo. 2004–108. In contrast, only a passive trade or

business is required for deductibility of research and development costs under section 174 (“in connection with a trade or business”). Moreover, the taxpayer claiming a research and development cost need not be engaged in a trade or business at the time of the expenditure to qualify for the deduction. *Smith v. Commissioner*, 937 F.2d 1089, 1097 n.9 (6th Cir. 1991) (quoting *Diamond v. Commissioner*, 930 F.2d 372 (4th Cir. 1991)), revg. 91 T.C. 733 (1988).

Petitioners argue that the trade or business requirement imposed by section 197 is similar to the less stringent requirement imposed by section 174. See *Snow v. Commissioner*, 416 U.S. 500 (1974). They argue that both sections 174 and 197 contain the phrase “in connection with” and both should therefore have the same meaning. Petitioners’ interpretation fails, however, to consider the entire phrase. The entire phrase in section 197 is “in connection with the *conduct* of a trade or business.” (Emphasis added.) The inclusion of the word “conduct” indicates to us that the intangibles must be used in connection with a business that is being conducted. We find, therefore, that section 197 contains an active trade or business requirement similar to the requirement imposed by section 162. [14]

We have already determined that Alpine was not engaged in an active trade or business. The Alpine license holding entities were formed for the sole purpose of serving Alpine’s business and depended on Alpine for revenue. We therefore find, by extension, that the Alpine license holding entities were not engaged in an active trade or business and are not entitled to amortization deductions for the licenses.

We earlier issued an Opinion, *Broz v. Commissioner*, 137 T.C. 25 (2011), in which we found for respondent as to the class life for depreciation purposes.

---

[14] Moreover, regulations have been promulgated that reinforce the trade or business requirement in sec. 197. The regulations clarify that amortization under sec. 197 begins on the later of—

  (A) The first day of the month in which the property is acquired; or
  (B) In the case of property held in connection with the conduct of a trade or business or in an activity described in section 212, the first day of the month in which * * * the activity begins.
  [Sec. 1.197–2(f)(1)(i), Income Tax Regs.]

The regulations apply only to property acquired after Jan. 25, 2000. Nevertheless, the regulations further support our determination that intangible property cannot be amortized if the trade or business or activity to which it relates has yet to commence. See *Frontier Chevrolet Co. v. Commissioner*, 116 T.C. 289, 294 n.10 (2001).

We have considered all arguments made in reaching our decision, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*