T.C. Memo. 2000-139


UNITED STATES TAX COURT


DANIEL J. CULNEN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 25551-92, 6496-94.            Filed April 13, 2000.


    The issues for decision are:  (1) whether P had
sufficient basis with respect to an S corporation
to permit him to deduct his pro rata share of
that corporation's ordinary losses for the years in
question; and (2) whether (A) the corporation suffered
a sec. 1231, I.R.C., loss from the disposition of
property in one of those years and (B) P had sufficient
basis to permit him to deduct his pro rata share of
that loss.
    1.  <u>Held</u>:  P established that he had sufficient
basis for all years;
    2.  <u>Held</u>, <u>further</u>, P established that the
S corporation suffered only a portion of the sec. 1231,
I.R.C., loss claimed; <u>held</u>, <u>further</u>, P had sufficient
basis to deduct his portion of the loss suffered.

Frank Agostino, for petitioner.

Steven W. Ianacone, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


HALPERN, Judge:  These consolidated cases involve the following determinations by respondent of deficiencies in, additions to, and penalties on petitioner's Federal income tax:

| | | Additions to Tax & Penalties | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6661 | Sec. 6662 | Sec. 6663 |
| 1987 | $271,885 | $48,616 | $67,971 | -- | -- |
| 1989 | 217,204 | 42,824 | -- | -- | $162,903 |
| 1990 | 381,883 | 88,399 | -- | $75,524 | -- |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are:  (1) Whether petitioner had sufficient basis with respect to an S corporation for his taxable (calendar) years 1987, 1989, and 1990 to permit him to deduct his pro rata share of the corporation's ordinary losses for those years in the amounts of $388,106, $651,357, and $213,732, respectively; and (2) whether (A) the corporation suffered a section 1231 loss from the disposition of property in 1990 and (B) petitioner had sufficient basis to permit him to deduct his pro rata share, $1,759,987, of that loss.

FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulation of facts, with attached exhibits, is incorporated herein by this reference.

At the time the petitions were filed, petitioner resided in Totowa, New Jersey.

Wedgewood Associates, Inc.

During the years in issue, Wedgewood Associates, Inc., a New Jersey corporation (Wedgewood), was an S corporation, see sec. 1361(a)(1), making its return of income on the basis of a calendar year.  Wedgewood was in the restaurant business.  In or before 1987, petitioner became a shareholder in Wedgewood. Beginning in 1987 and ending in 1990, petitioner owned the following percentages of Wedgewood's shares:

| Year | Percentage |
|------|------------|
| 1987 | 39.48 |
| 1988 | 52.00 |
| 1989 | 73.00 |
| 1990 | 73.00 |

Wedgewood was unsuccessful in the restaurant business.  It ceased doing business sometime in 1990, and, on or about March 14, 1990, by Deed of Assignment for the Benefit of Creditors (the deed), it conveyed its property for the benefit of those creditors. Attached to the deed is a "Statement of Assets", which lists restaurant fixtures, equipment and furnishings subject to liens of $1,865,000, a liquor license, cash on hand, accounts

receivable, and liquor inventory.  Only the liquor license and liquor inventory are shown to have a value, $100,000 and $1,000, respectively.[1]

Culnen & Hamilton, Inc.

During the years in issue, Culnen & Hamilton, Inc. (Culnen & Hamilton) was an insurance producer licensed by the State of New Jersey.  During those years, petitioner was the sole shareholder of Culnen & Hamilton.  Culnen & Hamilton made its return of income on the basis of a fiscal year ending on January 31.  From February 1, 1986, through May 31, 1987, Culnen & Hamilton was an S corporation; after May 31, 1987, Culnen & Hamilton was a C corporation.  See sec. 1361(a)(2).

Wedgewood's Payments

On 46 occasions, from April 1987 through January 1990, Culnen & Hamilton made payments by check and, on one of those occasions, by wire transfer to Wedgewood (without distinction, the 46 checks), in amounts totaling $4,034,017.41.[2]  The

---

[1]     The record is unclear with regard to the total value of the liquor license and liquor inventory.  While they were the only assets listed as having value, the statement of assets listed the total value of assets as $110,000 (not $101,000).

[2]     The amounts for each year are as follows:

| Year | Amount |
| --- | --- |
| 1987 | $1,968,000.00 |
| 1988 | 1,691,537.36 |
| 1989 | 368,410.05 |

(continued...)

46 checks were issued to Wedgewood on behalf of petitioner.  The payments represented by the 46 checks were shown on the books of Culnen & Hamilton as shareholder loans.  The 46 checks were deposited into a bank account of Wedgewood, and their receipt was shown on the books of Wedgewood as indebtedness to petitioner. At some point during the years in issue, there was a reduction of $375,000 in the total amount of $4,034,017.41 shown on the books of both Wedgewood and Culnen & Hamilton to reflect partial repayments.

On 28 occasions, from April 1989 through March 1992, Culnen & Hamilton issued checks in payment of expenses of Wedgewood's, in amounts totaling $501,918.22 (the 28 checks).[3]  The payments represented by the 28 checks were shown on the books of Culnen & Hamilton as officer loans and on the books of Wedgewood as indebtedness to petitioner.

On six occasions, from February 1987 through August 1990, Culnen & Hamilton issued checks in payment of, or with respect

---

[2](...continued)

| | |
|---|---|
| 1990 | 6,070.00 |
| Total | 4,034,017.41 |

[3]  The amounts for each year are as follows:

| Year | Amount |
|---|---|
| 1989 | $97,078.50 |
| 1990 | 404,130.86 |
| 1991 | 683.86 |
| 1992 | 25.00 |
| Total | 501,918.22 |

to, petitioner's purchase from a Dr. Nagel of Dr. Nagel's interest in Wedgewood, in amounts totaling $568,152.17 (the six checks).[4] The payments represented by the six checks were shown on the books of Culnen & Hamilton as officer loans.

On eight occasions, from April 1987 through December 1991, Culnen & Hamilton paid certain other amounts, at least some of which related to petitioner's investment in Wedgewood in amounts totaling $737,733.27 (the eight payments).[5] The payments represented by the eight payments were shown on the books of Culnen & Hamilton as officer loans.

For 1987 through 1989, Wedgewood recorded on its books interest due to petitioner in the amounts of $38,991.08, $250,918.44, and $326,160.97, respectively (for a total of $616,070.49.)

---

[4]     The amounts for each year are as follows:

| Year | Amount |
|------|--------|
| 1987 | $335,000.00 |
| 1989 | 80,214.07 |
| 1990 | 152,938.10 |
| Total | $568,152.17 |

[5]     The amounts for each year are as follows:

| Year | Amount |
|------|--------|
| 1987 | $72,143.21 |
| 1988 | 300,000.00 |
| 1989 | 202,000.00 |
| 1990 | 135,061.97 |
| 1991 | 28,528.09 |
| Total | 737,733.27 |

Wedgewood's Income Tax Returns

Wedgewood's Federal income tax returns for 1987 through 1990 show the following balance sheet entries with respect to loans from shareholders:

| Year | Beginning Balance | Ending Balance |
|------|-------------------|----------------|
| 1987 | $186,827 | $1,773,887 |
| 1988 | 1,773,887 | 3,530,306 |
| 1989 | 3,530,306 | 4,380,992 |
| 1990 | 4,380,992 | 6,097,200 |

Wedgewood's Federal income tax return for 1990 (the 1990 return) includes a Form 4797, Sale of Business Property, which shows a disposition of furniture and fixtures acquired on April 1, 1988, at a cost of $2,780,959, and disposed of on September 1, 1990. There is no gross sales price shown, and a loss is claimed in the amount of $2,506,244, which is the acquisition price less depreciation (the difference being Wedgewood's adjusted basis in the property). Taking into account certain other entries on the Form 4797, the net loss reported on that form is $2,410,941 (the Form 4797 loss). A Schedule K-1, Shareholder's Share of Income, Credits, Deductions, Etc., accompanying the 1990 return, reports that petitioner's share of the Form 4797 loss is $1,759,987.

Culnen & Hamilton's Income Tax Returns

Culnen & Hamilton's Federal income tax returns for 1987 through 1989 show the following balance sheet entries with respect to loans to stockholders:

| Year | Beginning Balance | Ending Balance |
|------|-------------------|----------------|
| 1987 | $1,814,212 | $1,712,517 |
| 1988 | 1,712,517 | 4,329,091 |
| 1989 | 4,329,091 | 6,702,399 |

Petitioner's Income Tax Returns

On petitioner's income tax returns for 1987, 1989, and 1990 he claimed the following losses from Wedgewood:

| Year | Loss |
|------|------|
| 1987 | $388,106 |
| 1989 | 651,357 |
| 1990 | 213,732 |

On petitioner's 1990 income tax return, he also claimed his share of the Form 4797 loss in the amount of $1,759,987 (the $1,759,987 loss).

OPINION

I. Introduction

Respondent disallowed petitioner's pro rata share of Wedgewood's ordinary losses for 1987, 1989, and 1990 because petitioner failed to convince respondent that he had an adequate basis with respect to his investment in Wedgewood. We must determine that basis. Respondent disallowed petitioner's share of the Form 4797 loss (the $1,759,987 loss) for the same reason and because petitioner failed to convince respondent that

Wedgewood suffered the $1,759,987 loss.  We must determine both his basis and whether Wedgewood suffered any loss.[6]

Petitioner bears the burden of proof.  See Rule 142(a).

II. Petitioner's Basis With Respect to Wedgewood

A. Principal Statutory Provisions

Section 1366(a)(1) provides that a shareholder of an S corporation shall take into account his pro rata share of the S corporation's items of income, loss, deduction, or credit for the S corporation's taxable year ending in the shareholder's taxable year.  Section 1366(d), however, imposes a limit on the amount of such losses and deductions (without distinction, losses) that a shareholder may take into account for any taxable year.  He may not take into account an aggregate amount of such losses exceeding the sum of (1) his adjusted basis in the stock of the S corporation and (2) his adjusted basis in any indebtedness of the S corporation to the shareholder (collectively, his S corporation investment).  See sec. 1366(d)(1).  Any losses so disallowed may be carried forward indefinitely.  See sec. 1366(d)(2).

---

[6] In the statutory notice of deficiency, respondent sets forth numerous grounds for disallowing the $1,759,987 loss.  On brief, respondent's principal argument (other than that petitioner lacks sufficient adjusted basis in his investment in Wedgewood) is that petitioner has failed to show that Wedgewood realized any loss.  We assume that respondent has conceded any other grounds.

B.  Disagreement Between the Parties

To deduct his pro rata share of Wedgewood's losses, petitioner must prove that he had sufficient adjusted basis in his S corporation investment (with respect to Wedgewood, petitioner's Wedgewood investment).  Generally, cost defines an S corporation shareholder's initial basis in his S corporation investment acquired for cash.  See sec. 1012.  Adjusted basis is determined by making certain adjustments to cost basis.  See sec. 1016.  Section 1367 provides additional, special rules with respect to adjusting basis in an S corporation investment.  The disagreement between the parties concerns only petitioner's cost basis in his Wedgewood investment.  The parties disagree as to whether petitioner's cost basis in his Wedgewood investment includes the various payments represented by the 46 checks, the 28 checks, the 6 checks, and the 8 payments (collectively, the Wedgewood payments).  Respondent denies that the Wedgewood payments represent petitioner's cost in obtaining his Wedgewood investment.  Respondent insists that the Wedgewood payments constitute an investment by Culnen & Hamilton (not petitioner) in Wedgewood.[7]  Petitioner insists that the Wedgewood payments

_____

[7]    Although respondent denies that the Wedgewood payments represent petitioner's cost in obtaining his Wedgewood investment, respondent agrees with our finding that, for 1987 through 1990, petitioner's percentage ownership in Wedgewood increased from 39.48 to 73 percent.  Petitioner testified
(continued...)

represent petitioner's cost in obtaining his Wedgewood investment.

C.  Petitioner's Burden

To prevail, petitioner must prove that he, not Culnen & Hamilton, invested in Wedgewood.  See, e.g., Prashker v. Commissioner, 59 T.C. 172, 176 (1972) (estate, of which taxpayer was executrix and sole beneficiary, advanced funds to S corporation of which she was 50 percent shareholder:  "[T]he key question is whether or not the debt of the corporation runs 'directly to the shareholder.'").  To prove that petitioner invested in Wedgewood, he must prove that the Wedgewood payments created indebtedness on the part of Wedgewood to him.  See Bolding v. Commissioner, 117 F.3d 270 (5th Cir. 1997) (true obligor on bank line of credit extended to S corporation was shareholder in his individual capacity and not on behalf of corporation), revg. on another issue T.C. Memo. 1995-326; Prashker v. Commissioner, supra at 176 ("a shareholder could borrow the money personally and then loan the money to the corporation.  In that event, the corporation's debt would run directly to the shareholder.").

---

[7](...continued)
credibly that all of his investment in Wedgewood was reflected in the Wedgewood payments.  We cannot reconcile respondent's agreement that petitioner owned a substantial portion of Wedgewood's shares with his argument that the Wedgewood payments constitute an investment by Culnen & Hamilton.

In his brief, respondent heads one of his arguments that petitioner did not have sufficient basis in his Wedgewood investment as follows:

> The fact that all payments to Wedgewood Associates, Inc. came directly from Culnen and Hamilton, <u>precludes</u> petitioner from claiming those amounts as his basis in Wedgewood and thus, the Schedule E losses. [Emphasis added.]

If respondent is suggesting that the question of whether Culnen & Hamilton lent those amounts to petitioner is irrelevant since, as a matter of law, direct payments by Culnen & Hamilton to Wedgewood establish Culnen & Hamilton's status as the investor in Wedgewood, he is wrong. In <u>Hitchins v. Commissioner</u>, 103 T.C. 711 (1994), in explaining the statutory requirement that the indebtedness of the S corporation must run directly to the shareholder, we made it clear that an indebtedness to an entity with passthrough characteristics that has advanced the funds to the S corporation and is closely related to the taxpayer does not satisfy the statutory requirement. See <u>id.</u> at 715. We did not say, however, that the fact that the borrowed funds originate with the closely related entity precludes the indebtedness of the S corporation from running directly to the shareholder. Certainly, where there is a close relationship among the S corporation, the taxpayer, and the related entity, we will scrutinize the relationships established with respect to the transfer of funds to ensure that those relationships comport with

the statutory requirement.  Respondent proposes <u>Underwood v.</u>
<u>Commissioner</u>, 63 T.C. 468 (1975), affd. 535 F.2d 309 (5th Cir.
1976), as a model for us to follow in this case.  In <u>Underwood</u>,
the taxpayer's S corporation was indebted to a second corporation
owned by him.  The taxpayer interposed himself between the two
corporations by causing the corporations to substitute for the
one-legged indebtedness running between the S corporation and the
second corporation a two-legged indebtedness, running, first,
from the S corporation to him and, second, from him to the second
corporation.  We concluded that the taxpayer had paid out no
funds and would not until his note to the second corporation came
due.  On that basis, we were unable to distinguish his liability
from that of a guarantor, who makes no investment until he pays
his obligation.  See <u>id.</u> at 475-476.  We relied on a long list of
cases for the proposition (which we applied to the taxpayer)
"that basis-giving indebtedness for the purposes of section
1374(c)(2)(B) does not arise where a shareholder merely
guarantees a subchapter S corporation's debt".[8]  <u>Id.</u> at 475.
That is true, but that is not the case here.

---

[8]    Sec. 1374(c)(2)(B), as in effect at the time,
determined basis in indebtedness as of the close of the
corporation's year.

D.  Discussion

    1.  Petitioner's Case

Petitioner called four witnesses, including himself, all of whom testified consistently that, for many years (including the years in question), petitioner had used Culnen & Hamilton as an incorporated pocketbook, having the corporation make payments on his behalf, which payments were posted to Culnen & Hamilton's books as loans to petitioner.  Robert Levin, one of those four witnesses, had been petitioner's accountant for more than 20 years.  He also did accounting work for Culnen & Hamilton.  He testified that, from time to time, petitioner would reduce the balance of his Culnen & Hamilton loan account by liquidating investments he had made and paying the proceeds to Culnen & Hamilton.  Mr. Levin explained the rationale for that procedure as follows:

> Culnen & Hamilton was an "S" corporation.  There was a lot of undistributed taxable income.  He [petitioner] wouldn't take all the--he'd pay taxes on it, and, God knows, he paid a lot of taxes over the years, but he felt the money that was left in Culnen & Hamilton, because it was undistributed to him, that he could spend and do what he wanted with.
>
> So, rather than write a check to himself and write a check to a third party, he would just--if he wanted to buy a company or whatever, he would just write it out--have Beatrice, the bookkeeper, write it out of Culnen & Hamilton, charge it to his loan account, okay, and that's the way he did business for the 20 years that I've been his accountant.

Although Culnen & Hamilton was an S corporation only until May 31, 1987, Mr. Levin's testimony presents a credible explanation of petitioner's relationship with Culnen & Hamilton.

Janet Sacklow is a partner in the accounting firm of Amsterdam, Sacklow & Acox. That firm also did accounting work for Culnen & Hamilton, including preparing various financial records and its income tax returns for the years in question. Ms. Sacklow testified that she treated the Wedgewood payments as loans to petitioner for purposes of both Culnen & Hamilton's books and records and its income tax returns. She testified that the initial record of the Wedgewood payments was made by Culnen & Hamilton's bookkeeper, Beatrice, who would record the Wedgewood payments on the corporation's general ledger under the heading "Wedgewood" (the Wedgewood entries). Beatrice made the Wedgewood entries monthly. Ms. Sacklow testified that she was responsible for classifying the Wedgewood entries as loans to petitioner. She testified that she made that determination based on conversations with petitioner and because she believed that Culnen & Hamilton had no association with Wedgewood: "It was only because of Dan Culnen that the money was coming from that location [i.e., from Culnen & Hamilton]." The parties have stipulated a letter dated February 11, 1993, from Ms. Sacklow

to Walter J. Pagano, c.P.A. (the Sacklow letter).[9]  The Sacklow letter states:  "Enclosed are the schedules of amounts loaned to Wedgewood Associates and Dan's acquisition costs for stock and partnership interests."  Ms. Sacklow testified that she prepared those schedules (the schedules) from the books and records of Culnen & Hamilton.  The first of the schedules relates to the 46 checks and states that they were "deposited into Wedgewood Associates accounts, on behalf of Daniel Culnen."  The third of the schedules relates to the six checks and states:  "Daniel Culnen's purchase of Dr. Nagle's Interest".  The final page of the schedules states:

Summary

| | |
|---|---|
| Net Checks Written to Wedgewood from Culnen and Hamilton | $3,659,017.41 |
| Checks written from Culnen and Hamilton on behalf of Wedgewood | 501,918.22 |
| Dan's purchase of Dr. Nagle's interest | 568,152.17 |
| Other Items | 737,733.27 |
| Interest Accrued | 616,070.49 |
| Total | $6,082,891.56 |

Of this total, $300,000 is classified as Capital Stock in Wedgewood Associates, and $300,000 is Dan's cost of purchasing Manning's partnership interest.  $568,152.17 is Dan's cost for Nagle's interest in stock and partnership.  This leaves a balance of $4,914,739.39 as a loan to the corporation.

---

[9]    By the stipulation, respondent reserved the right to make a relevance objection to the Sacklow letter, but respondent waived all other evidentiary objections, including an objection based on hearsay.  See Fed. R. Evid. 802.

Ms. Sacklow's firm also did accounting work for Wedgewood. She would assist Wedgewood's employees in keeping Wedgewood's books and would prepare Wedgewood's end-of-the-year tax returns. She testified that the Wedgewood payments were shown as an indebtedness from Wedgewood to petitioner on Wedgewood's books and records. Mr. Levin, who prepared petitioner's personal financial statements, which showed Wedgewood as an investment of petitioner's, believed "absolutely" that petitioner owned the shares of Wedgewood individually.

### 2. Respondent's Case

Respondent called no witnesses and introduced no exhibits other than those attached to the stipulation. Besides respondent's argument (which we have rejected) that, because of the Wedgewood payments, petitioner is precluded from claiming basis in his Wedgewood investment, respondent's other argument is, basically, that the testimony of petitioner and his witnesses is unsupported and, thus, not to be believed.

Petitioner, Mr. Levin, and Ms. Sacklow (the witnesses) all testified that the Wedgewood payments were made by Culnen & Hamilton to Wedgewood on petitioner's behalf. The fact that the payments were made is beyond question. Indeed, during the trial, the Court asked counsel for respondent: "Mr. Ianacone, is it a fact for purposes of this case that those checks [the 46 checks] * * * were written by Culnen & Hamilton and deposited for the

benefit of Mr. Culnen into the accounts of Wedgewood?  Is that a fact:  Yes or no?"  Mr. Ianacone responded:  "Yes, it is."  Thus, the only question subject to proof is whether the Wedgewood payments were made by Culnen & Hamilton on behalf of petitioner. While it is true that there are no original Culnen & Hamilton accounting records in evidence (other than copies of its tax returns), the Sacklow letter is in evidence, and it supports the testimony of the witnesses.  Ms. Sacklow testified that she prepared the Sacklow letter from the books and records of Culnen & Hamilton, and she traced the treatment of the Wedgewood payments from the bookkeeper's scheduling of them through her (Ms. Sacklow's) classification of them as loans to petitioner, to their entry onto the books and records of Culnen & Hamilton.[10] While respondent may claim that the Sacklow letter is not a substitute for the original books and records of Culnen & Hamilton, respondent cannot claim that petitioner has presented no evidence to support the witnesses' testimony.  The Sacklow letter is such evidence, and, moreover, the Sacklow letter is a joint exhibit.  Respondent may also claim that he did not know what Ms. Sacklow would say about the Sacklow letter, but he could have discovered that before he agreed to make it a joint exhibit. Since respondent stipulated the Sacklow letter (waiving any

---

[10]    Ms. Sacklow testified that consistent entries were made on the books and records of Wedgewood.

hearsay objection), we believe that petitioner justifiably concluded that the content of Culnen & Hamilton's books was not an issue in this case. Respondent's claim that, essentially, the witnesses' testimony should be disregarded because it is unsupported is not persuasive.

Beyond respondent's claim that petitioner's witnesses' testimony is unsupported, respondent makes unsupported, unpersuasive, and offensive attacks on the credibility of petitioner and the ethics of his witnesses. There are legitimate issues in this case, but the ethics of petitioner's witnesses are not among them. Respondent has, here, all too clearly relied on the tactic of trial by cross-examination, and that tactic has failed. A resort to name-calling is not an acceptable fallback position. We disapprove of that tactic.

E. Conclusions

We conclude, and find, that petitioner had adequate adjusted basis in his Wedgewood investment to deduct his pro rata share of Wedgewood's losses for 1987, 1989, and 1990 and his share of the Form 4797 loss (if any).[11]

---

[11] Apparently, respondent's position is that none of the Wedgewood payments add to petitioner's adjusted basis in his Wedgewood investment (but see supra note 7). Petitioner's position is that all of the Wedgewood payments add to petitioner's adjusted basis in his Wedgewood investment. We have not made specific findings as to the amount of petitioner's adjusted basis in his Wedgewood investment for each of the years
(continued...)

III.  The Form 4797 Loss

    A.  Introduction

    Petitioner reported his share of the Form 4797 loss, in the amount of $1,759,987.  Principally, the Form 4797 loss resulted from Wedgewood's disposition of furniture, fixtures, restaurant equipment, a liquor license, and a liquor inventory (the assets).  The assets were disposed of pursuant to the deed.  At least some of the assets were subject to liens of secured creditors totaling $1,865,000 (the liens).  Wedgewood's adjusted basis in the assets at the time of disposition was $2,506,244.  Pursuant to the deed, Wedgewood received nominal consideration of $1, and the disposition was part of a bankruptcylike proceeding carried out under the laws of New Jersey.  See N.J. Stat. Ann. secs. 2A:19-1 to 2A:19-50 (West 1987).  The disposition was to an assignee for the benefit of Wedgewood's creditors (the assignee), whose duty it was to liquidate the assets and apply the proceeds to reduce Wedgewood's indebtedness.  See In re:  Gen. Assignment for Benefit of Creditors, 169 A.2d 236 (N.J. Super. Ct. 1961).

    B.  Code and Regulations

    In pertinent part, section 1001(a) provides that the loss from the disposition of property shall be the excess of the

_____

[11](...continued)
here in question because we believe that the parties are in agreement that we should make an across-the-board decision with respect to the Wedgewood payments.

adjusted basis in the property over the amount realized.  As used in section 1001(a), the term "amount realized" is defined in section 1001(b).  In pertinent part, that definition is:  "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received."  Section 1.1001-2, Income Tax Regs., addresses the discharge of liabilities in connection with the disposition of property.  Paragraph (a)(1) of section 1.1001-2, Income Tax Regs., provides the general rule that the amount realized from the sale or other disposition of property includes the amount of liabilities from which the transferor is discharged as a result of the disposition. Paragraph (a)(4) of section 1.1001-2, Income Tax Regs., provides that, for purposes of that section, the sale or other disposition of property that secures a nonrecourse liability discharges that liability.  Paragraph (b) of section 1.1001-2, Income Tax Regs., provides that, generally, the fair market value of the security at the time of sale is not relevant for determining the amount of liabilities from which the taxpayer is discharged, or treated as discharged.

C.  <u>Discussion</u>

Respondent's position is that Wedgewood did not realize any loss.  Petitioner's position is that, since Wedgewood's adjusted basis in the assets exceeded the $1 received pursuant to the

deed, of course it suffered a loss. Petitioner has failed to prove that $1 was the full amount realized on the disposition of the assets. On brief, petitioner states: "Wedgewood's liabilities greatly exceeded the fair market value of its assets." That may be so. Nevertheless, petitioner has failed to show that the indebtedness secured by the liens was other than nonrecourse. If it was nonrecourse, then, notwithstanding the fair market value of the assets subject to those liens, the amount realized on the disposition of those assets included the amount of the liens, $1,865,000. We assume that the liquor license and liquor inventory were sold for $126,000.[12] Petitioner has failed to argue that the amount realized by Wedgewood does not include any actual cash proceeds from the sale of assets not subject to liens. Thus, the amount realized on the disposition of the assets was $1,991,001, which is the sum of the indebtedness discharged, the cash proceeds of $126,000, and the nominal cash of $1. Since Wedgewood's adjusted basis in the assets was $2,506,244, Wedgewood's loss was $515,243 ($515,243 = $2,506,244 - 1,991,001).

---

[12]    According to Wedgewood's Form 4797 for taxable year 1990, the liquor license sold for $125,000. We add to that amount the $1,000 listed value of the liquor inventory from the deed for $126,000.

D.  Underline Conclusion

We find that Wedgewood realized a loss of $515,243 on the disposition of the assets.  Petitioner's pro rata share of that loss was $376,127 (i.e., 73 percent of $515,243).  We have already found in section II.E., _supra_, that petitioner had sufficient basis to deduct his pro rata share of the Form 4797 loss, $376,172.

Decisions will be entered under Rule 155.