*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0248p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
———————————

ROBERT BROZ; KIMBERLY BROZ,
               *Petitioners-Appellants*,

    *v.*

COMMISSIONER OF INTERNAL REVENUE,
              *Respondent-Appellee.*

No. 12-1403

Appeal from the United States Tax Court
No. 21629-06—Diane L. Kroupa, Tax Court Judge.

Argued: January 15, 2013

Decided and Filed:  August 23, 2013

Before:  BOGGS, ROGERS, and STRANCH, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Loren M. Opper, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellants.  Arthur T. Catterall, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Loren M. Opper, Paul D. Hudson, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellants.  Arthur T. Catterall, Teresa E. McLaughlin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.  Robert and Kimberly Broz appeal the judgment of the United States Tax Court affirming the Commissioner of Internal Revenue's finding of an $18 million deficiency in their joint tax filings for the years 1996, 1998, 1999, 2000, and 2001.  Robert Broz claims that he was "at risk" and had sufficient debt basis in Alpine PCS, a subchapter S corporation, to deduct its pass-through losses.  Broz also

1

argues that he made valid business-expense and amortization deductions for the activities of the Alpine license-holding entities, which were limited-liability companies taxed as partnerships. Because Broz lacked sufficient debt basis in Alpine PCS, the Tax Court properly disallowed his deductions for Alpine PCS's pass-through losses. In addition, because the other Alpine entities were never engaged in any active trade or business, the Tax Court properly disallowed Broz's business-expense and amortization deductions for those entities. The Tax Court therefore properly disallowed the pass-through losses and other claimed deductions.

Robert Broz[1] started a cellular telephone business in the 1990s by organizing a wholly owned S corporation, RFB Cellular, Inc., in 1991. That same year he purchased an FCC license to operate a cellular network in Northern Michigan. Broz later expanded his cellular telephone business by organizing additional entities: Alpine PCS, Inc., an S corporation 99-percent owned by Broz (the balance was owned by his brother), which was created to bid on more FCC licenses and to construct and operate digital networks servicing new license areas; several Alpine license-holding entities—limited liability companies that are taxed as partnerships—formed to hold and lease the additional FCC licenses Broz acquired[2]; Alpine Investments, LLC, a financing intermediary; and Alpine PCS Operating, LLC ("Alpine Operating"), an equipment-holding entity.[3] Alpine Investments and Alpine Operating are both limited liability companies wholly owned by Broz and disregarded for tax purposes.

Alpine PCS never operated any on-air networks during the years at issue. RFB operated the only on-air networks. RFB used Alpine PCS's licenses, on a limited basis,

---

[1] Robert Broz's wife Kimberly is a party only because she filed joint tax returns with her husband.

[2] The Alpine license-holding entities are Alpine Michigan F LLC, Alpine PCS - California F, LLC, Alpine Fresno C, LLC, and Alpine Hyannis F, LLC. Broz owned 99-percent of each Alpine license-holding entity. Broz's brother owned the remaining one percent in each entity.

[3] Broz organized Alpine Investments as an intermediary for moving money between RFB and the Alpine entities after his tax advisers counseled him that he needed to increase his basis in the Alpine entities, and because CoBank, ACB, the institution financing Broz's business endeavors, prohibited the distribution of loan proceeds to an individual. Broz organized Alpine Operating to hold and lease physical equipment. It reported no income and did not claim any depreciation deductions for the equipment during the years at issue, but claimed interest and automobile depreciation deductions for 1999 and 2000.

to provide digital service in geographic areas that RFB's analog licenses already covered. Only two Alpine entities (Alpine PCS and Alpine Michigan F) reported any income—$1,312 and $67,423, respectively, allocated by RFB for RFB's use of the FCC licenses in 2001. Alpine PCS did not report income during any of the other years at issue, but claimed depreciation deductions, interest deductions on debt owed to the FCC, and interest deductions on debt owed to RFB—even though Alpine PCS never made any interest payments. Alpine PCS also amortized and deducted startup expenses, even though Alpine PCS had not made a formal election under § 195(b) of the tax code.[4] The Alpine license-holding entities each claimed amortization deductions related to the licenses and deducted interest paid on amounts borrowed to service the FCC debt. Alpine PCS and the license-holding entities ceased all business activities by the end of 2002.

For the tax years at issue, Broz deducted the flow-through losses of Alpine PCS on his personal income taxes, on the grounds that he had debt basis in, and was "at risk" with respect to, Alpine PCS. He also deducted interest, depreciation, startup costs, and other business expenses of the Alpine entities. Finally, he deducted the amortization cost of the FCC cellular licenses acquired and held by the Alpine license-holding entities.

The IRS Commissioner determined a deficiency of approximately $18 million in Broz's income tax filings for the tax years at issue. The Commissioner found that Broz had insufficient debt basis in Alpine PCS to claim flow-through losses for the years at issue. The Commissioner also determined that Broz was not at risk with respect to his investments in the Alpine entities and was therefore not entitled to claim those entities' loss deductions. The Commissioner found that the Alpine entities were not entitled to interest, depreciation, startup expense, and other business-related deductions because they were not engaged in an active trade or business during the years at issue. Finally, the Commissioner disallowed the Alpine license-holding entities' amortization

---

[4]A taxpayer may elect to deduct a limited amount of startup expenses under I.R.C. § 195 in the year the business begins, and may amortize the remainder of startup costs over a 180-month period. *See* I.R.C. § 195(b)(1).

deductions because those entities were not engaged in an active trade or business during the years at issue.

The Tax Court ruled in the Commissioner's favor on each issue, finding that (1) Broz lacked debt basis in Alpine PCS to deduct its flow-through losses, (2) Broz was not at risk with respect to his investments in Alpine PCS and the Alpine license-holding entities, and for that additional reason could not deduct for flow-through losses, (3) Alpine PCS and Alpine Operating were not entitled to deductions for business expenses because they were not actively engaged in a trade or business, and (4) the Alpine license-holding entities were not entitled to amortization deductions because they were not engaged in an active trade or business. *Broz v. Comm'r*, 137 T.C. 46 (2011).

On the debt basis issue, the Tax Court determined that the loan ran, in substance, from RFB to Alpine PCS, and that Broz operated merely as a conduit for the funding and did not thereby obtain debt basis in Alpine PCS because there was no evidence that Alpine PCS was genuinely indebted to Broz rather than RFB. The Tax Court noted that although interest accrued on the unsecured promissory notes that Broz issued, no payments were made and Broz signed the promissory notes on behalf of all the Alpine entities, making it unlikely that those entities would seek payment from Broz. Accordingly, the notes did not establish genuine indebtedness. The Tax Court also found that the funds paid to Alpine PCS from the CoBank loan proceeds were initially characterized as advances from RFB and were only later recharacterized as loans from Broz through year-end reclassifying journal entries and documents. Moreover, Broz offered no evidence of habitual payment to third parties to prove that RFB was Broz's "incorporated pocketbook" making the payments to Alpine PCS on Broz's behalf. The Tax Court also concluded that Broz did not establish any actual economic outlay showing that he incurred a cost because of his RFB stock pledge to secure the CoBank loan; that is, Broz did not establish that he was left poorer in any material sense. The Tax Court therefore applied the "step transaction doctrine" and ignored Broz's participation in the transaction by which RFB obtained a loan from CoBank and advanced those funds to Alpine PCS. *Id.* at 60–63.

On the "at risk" issue, the Tax Court rejected Broz's argument that his pledge of RFB stock to secure the CoBank loan placed him at risk within the meaning of § 465 of the tax code—meaning that Broz was disallowed from using the value of the RFB stock to increase the amount of loss deductions he could take. The Tax Court concluded that Broz was not at risk because the RFB stock pledged as security for the CoBank loan was related to—and therefore used in—the business. In analyzing the at-risk issue, the Tax Court considered whether the RFB stock that Broz pledged to secure the CoBank loan was property "used in the business" that did not place the taxpayer at risk because § 465 exempts such property pledges from at-risk amounts. The Tax Court also concluded that Broz was not at risk because Broz was never personally liable; the structure of the loan insulated him from any realistic possibility of a loss. *Id.* at 63–64.

On the business-expenses issue, the Tax Court held that the deductions were disallowed because the entities involved—Alpine PCS, the Alpine license-holding entities, and Alpine Operating—were not actively engaged in a trade or business. The Tax Court held that an entity must be considered in isolation and not in conjunction with related entities when determining whether the entity is actively engaged in a trade or business; therefore, RFB's activities had no bearing on whether each Alpine entity was actively engaged in a trade or business. The Tax Court found that because RFB operated the only functioning on-air networks, while none of the Alpine entities operated a functioning network or conducted any other activity for which it was formed, none of the Alpine entities was actively engaged in a trade or business. *Id.* at 65–66.

On the amortization issue, the Tax Court agreed with the Commissioner's reading of § 197 of the tax code and held that an intangible asset must be held in connection with an active trade or business to qualify as an "amortizable § 197 intangible" subject to amortization deductions. Examining the language of other sections of the tax code, the Tax Court determined that the inclusion of the word "conduct" in § 197 indicated that the section imposed an "active" trade or business requirement; the use of "conduct" made § 197 distinguishable from § 174 of the code,

which only requires that an asset be held in connection with a trade or business.  *Id.* at 67–69.

Broz appeals the Tax Court's judgment.

For the reasons that follow, the Tax Court correctly determined that Broz lacked the required basis in Alpine PCS, a subchapter S corporation for which such basis is required to permit pass-through losses. Moreover, the Tax Court also correctly rejected the business expenses and amortization deductions for the license-holding entities (which are taxed as partnerships, and not subchapter S corporations) because those entities were not engaged in an active trade or business. These holdings obviate the need for us to address the at-risk issue.

### Debt Basis

On the debt-basis issue, the Tax Court's finding that Broz lacked debt basis in Alpine PCS was not clearly erroneous because Broz served merely as a conduit for debt that ran, in substance, from Alpine PCS to RFB Cellular.  The Tax Court therefore properly disallowed Broz's deductions for Alpine PCS's flow-through losses.

Although a standard C corporation is liable for federal income taxes on its taxable income, an S corporation generally does not pay taxes at the corporation level. Instead, each shareholder of an S corporation pays taxes at individual rates on its pro rata share of the corporation's income (if any) and receives the pro rata tax benefits of the corporation.  *Maloof v. Comm'r*, 456 F.3d 645, 647 (6th Cir. 2006).  Under this pass-through system, the S corporation's income and losses essentially become the individual shareholder's.  However, the tax code limits the amount of pass-through loss deductions an individual shareholder may claim:  the deductions "[c]annot exceed shareholder's basis in stock and debt."  *Id.* (quoting I.R.C. § 1366(d)(1) (internal quotation marks omitted)); *see* 26 C.F.R. § 1.1366-2.  The debt-basis limit is determined by examining "the shareholder's adjusted basis of any indebtedness of the S corporation *to the shareholder*."     I.R.C. § 1366(d)(1)(B) (emphasis added).   An S corporation's

indebtedness to another entity, even one wholly owned by the shareholder, does not increase the amount of pass-through deductions the shareholder can claim.

For Broz to claim deductions on his individual income tax returns for the losses and expenses of Alpine PCS, he needed to have debt basis in Alpine PCS, and Alpine PCS's debt had to run directly to him. But that is not what happened. Instead, the recurring transactions by which Alpine PCS received funding involved the following three steps: (1) RFB obtained a loan from CoBank; (2) RFB advanced the CoBank loan proceeds to Alpine PCS; (3) using year-end accounting adjustments and postdated promissory notes, Broz recharacterized the second part of the transaction so that it appeared the CoBank loan proceeds were advanced from RFB to Broz and then loaned by Broz—or Alpine Investments, which for tax purposes is treated the same as Broz—to Alpine PCS. The Tax Court concluded that Broz served as a mere conduit for loans from RFB to Alpine PCS, that Alpine PCS was never directly indebted to Broz, and that the Commissioner thus properly disallowed Broz's income tax deductions on that basis. We review the Tax Court's factual determination for clear error. *The Limited, Inc. v. Comm'r*, 286 F.3d 324, 331 (6th Cir. 2002).

The Tax Court did not clearly err in finding that the purported back-to-back loan arrangement, which ran from RFB to either Broz or Alpine Investments,[5] and then on to Alpine PCS, did not establish *bona fide* indebtedness between Broz and Alpine. Broz provides no clear record evidence to support his theory that the debt, at the time it was incurred, was intended to run directly from Alpine PCS to either Broz or Alpine Investments. After-the-fact reclassification cannot satisfy the requirement that the debt run directly from the S corporation to the taxpayer/shareholder, and courts have previously rejected efforts by taxpayers to establish debt basis in an S corporation using this method. In *Ruckriegel v. Commissioner*, 91 T.C.M. (CCH) 1035, 2006 WL 1007628, at *12 (2006), the Tax Court held that promissory notes executed after the fact

___

[5]At some point during his business, Broz organized Alpine Investments, a limited liability company that he wholly owned and that is disregarded for tax purposes, to serve as a funding intermediary between RFB and Alpine PCS, at the behest of CoBank, which insisted that it could not disburse money directly to an individual.

"are more reflective of attempts to recharacterize prior debts" in a way that "would not justify treatment of those notes as anything more than guaranties of [the S corporation's] existing indebtedness . . . which would be ineffective to create bases in [the S corporation] under section 1366(d)(1)(B)." Broz's use of journal entries and promissory notes to insert himself into an already-completed transaction establishes only that he became the guarantor of the debt that already ran from Alpine PCS to RFB. This guaranty does not give Broz the debt basis in Alpine PCS necessary to deduct the S corporation's losses, because a taxpayer's guarantee and pledge of his assets, without more, do not establish indebtedness of the S corporation to the shareholder. *See Maloof*, 456 F.3d at 650.

The Tax Court has also rejected efforts by an S corporation shareholder to incur debt basis in that S corporation by lending money to it from another wholly owned entity. In *Russell v. Commissioner*, 96 T.C.M. (CCH) 302, 2008 WL 4756439, at *9 (2008), the Tax Court held that "[a] loan to an S corporation by another entity owned by the S corporation's shareholder is not an indebtedness of the S corporation to the shareholder." The Tax Court concluded that a ledger debt that is reclassified as a note payable to the shareholder does not, by itself, indicate that the debt ran directly to the shareholder at the time it was incurred because this adjustment is "insufficient to reclassify the source of a loan." *Id.* Accounting entries that are not contemporaneous with the actual funding advances do not establish the bona fides of the back-to-back loans at the time the advances were made. *See id.* at *10.

In sum, the Tax Court did not clearly err when it rejected, as a factual matter, Broz's effort to reclassify the debt. The intent at the time the money was loaned was that the debt run between Alpine PCS and RFB. Broz's *post facto* effort to insert himself as an intermediary did not increase his basis in Alpine PCS, and is of no tax consequence. *See Burnstein v. Comm'r*, 47 T.C.M. (CCH) 1100, 1984 WL 15384 (1984) (same

outcome under I.R.C. § 1374(c)(2), the virtually identical antecedent to I.R.C. § 1366(d)(1)(B)).[6]

In addition, the Tax Court did not err in concluding that RFB did not make the loans to Alpine PCS on Broz's behalf. A taxpayer can obtain debt basis in an S corporation through payments made by a wholly owned corporate entity if that entity functions as the shareholder's "incorporated pocketbook," meaning that the taxpayer has a "habitual practice of having his wholly owned corporation pay money to third parties on his behalf." *Ruckriegel*, 91 T.C.M. (CCH) 1035, at *10. But the Tax Court did not clearly err in finding that RFB was not Broz's incorporated pocketbook because Broz has not shown that he habitually used RFB to make payments or advances to third parties, and similar cases where the Tax Court has found that a taxpayer was genuinely out-of-pocket for payments or advances made by a wholly owned entity are distinguishable. *See*, *e.g., Yates v. Comm'r*, 82 T.C.M. (CCH) 805, 2001 WL 1221713 (2001); *Culnen v. Comm'r*, 79 T.C.M. (CCH) 1933, 2000 WL 378529 (2000).

Because the Tax Court found that Broz lacked sufficient debt basis in Alpine PCS to permit him to deduct flow-through losses for the tax years at issue, we need not reach the question of whether Broz was at risk with respect to Alpine PCS's activities. A deduction or loss "disallowed for the taxable year under section . . . 1366(d) is not taken into account for the taxable year in determining the loss from an activity . . . for purposes of applying section 465." 26 C.F.R. § 1.469-2T(d)(6)(iv). Because all of Broz's deductions with respect to Alpine PCS's losses were properly disallowed under the basis limitation in § 1366(d), those deductions are not taken into account under the at-risk rules in § 465(c).

Moreover, it is clear that to deduct S corporation losses, the taxpayer must both establish basis in the S corporation and be at risk in the S corporation's activities. "[E]ven if a shareholder otherwise is able to deduct an S corporation loss because she

---

[6]"The limitations provided in former section 1374(c)(2) were reenacted by section 2 of the Subchapter S Revision Act of 1982 as section 1366(d)(1) . . . ." *Uri v. Comm'r*, 56 T.C.M. (CCH) 1217, 1989 WL 8114, at n.3 (1989).

has sufficient basis, she cannot deduct it if she is not at risk. Conversely, a shareholder cannot deduct a Section 465 loss if she is at risk if she does not have a sufficient basis in the stock or debt of the S corporation to offset it." Deborah H. Schenk, *Federal Taxation of S Corporations* 7-52 (1985 & Supp. 2012). "The at-risk rules *apply after* the basis limitations . . . . In other words, losses are not tested under the at-risk rules until the shareholder has sufficient basis to deduct them." Sydney S. Traum & Judith Rood Traum, *The S Corporation Answer Book* 10:14 (7th ed. 2009) (emphasis added); *see* Jerald August, Overview of Taxation of S Corporations, University of Southern California School of Law 46th Institute on Federal Taxation - Major Tax Planning for 1994, P2201.5.

Commentators have noted that the at-risk limit in § 465 and the basis limit in § 1366(d) are functionally almost identical in the S corporation context. "[I]n function, the at-risk rules are similar to the basis limitation rules. This similarity may be why little attention has been paid to [the at-risk rules] in the S corporation context, even though they have applied since 1979 to all activities that are engaged in by a taxpayer subject to the rules to carry on a trade or business or produce income." Traum, *supra* at 10:14; *see also* Lorence Bravenec, *S Corporations and Shareholders Under the At Risk Rules of Section 465—Revisited*, 36 Tax Law. 765, 768 (1983). Courts have reached the same conclusion and have accordingly held that a taxpayer must cross both hurdles to deduct S corporation flow-through losses. For example, in *Oren v. Commissioner*, 357 F.3d 854, 859 (8th Cir. 2004), the Eighth Circuit held that even if the taxpayer had basis in the S corporations at issue, the taxpayer was not at risk under § 465 because the possibility of an actual loss was remote. With respect to both provisions of the tax code, the Eighth Circuit noted:

> The at risk analysis is very similar to the actual economic outlay analysis [under § 1366(d)]. We look to the economic reality of the situation to determine whether there was a realistic chance that [the taxpayer] might lose the money he loaned [to the S corporations], or, rather, whether the funds were protected from loss by the arrangement of the transactions.

*Id.* at 859–60 (internal quotation marks and citation omitted).

Although Broz's deductions for Alpine PCS's losses were properly disallowed for the tax years in question, those losses can be carried forward. As counsel for the Commissioner conceded at oral argument, both the debt-basis rule for S corporations and the at-risk rule are loss-suspension rules—which result in a loss being carried forward to subsequent tax years—not loss-disallowance rules. *See* Oral Arg. at 53:40.

*Business Expenses*

With respect to the business-expense deductions, the Tax Court's finding that the Alpine entities were not carrying on a trade or business during the tax years at issue was not clearly erroneous. The tax code allows a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business," I.R.C. § 162(a), but start-up expenditures cannot be deducted, I.R.C. § 195(a). The Tax Court found that the Alpine entities were not carrying on an active trade or business during the years at issue, and its findings of fact are reviewed for clear error. *See Rose v. Comm'r*, 868 F.2d 851, 853 (6th Cir. 1989).

The record supports the Tax Court's determination that Broz organized the Alpine entities to obtain FCC licenses and to construct and operate networks that would service the rural service areas covered by those licenses. *See Broz v. Comm'r*, 137 T.C. 46, 65 (2011). Alpine PCS's financial statement dated December 31, 1998 stated that the entity "was formed to obtain and operate under licenses issued by the [FCC] under Personal Communications Service (PCS) frequency blocks to provide broadband PCS." Ex. 16-J, CIR App'x Vol. 1, at 208. The Alpine license-holding entities were all formed to lease FCC licenses to Alpine PCS. Ex. 20-J, CIR App'x Vol. 2, at 16 (Alpine California); Ex. 23-J, CIR App'x Vol. 2, at 41 (Alpine Michigan); Ex. 26-J, CIR App'x Vol. 2, at 65 (Alpine Hyannis); Ex. 30-J, CIR App'x Vol. 2, at 108 (Alpine Fresno). Alpine Operating's stated objective was "to lease various [pieces of] equipment to Alpine PCS, Inc." Ex. 31-J, CIR App'x Vol. 2, at 110.

Because each entity's activity must be evaluated individually and not in conjunction with any other entity, the Alpine entities' activities cannot be viewed in connection with RFB's. *See Bennett Paper Corp. v. Comm'r*, 78 T.C. 458, 463–69

(1982), *aff'd*, 699 F.2d 450 (8th Cir. 1983). Viewed individually, no Alpine entity was performing activity consistent with its business purpose during the tax years at issue. Although Alpine PCS indicated in 1998 that it "expects to commence operations during late 1999 or early 2000," Ex. 16-J, CIR App'x Vol. 1, at 209, and issued similar statements in 1999 and 2001, *id.* at 211, 213, Alpine PCS never operated any networks. The Alpine license-holding entities did not lease any licenses to Alpine PCS. Alpine Operating did not lease any equipment to Alpine PCS. While RFB did lease some of the Alpine-entity licenses on a limited basis in 2001, the income was minimal and not sufficient to constitute an active trade or business. In a 1993 memorandum, the I.R.S. indicated that "the crucial prerequisite for deductibility of trade or business expenses under section 162 of the Code is that the enterprise incurring them must be beyond the point of mere preparation and actually be engaged in the primary activities intended." I.R.S. Tech. Adv. Mem. 93-31-001, at *7 (Aug. 6, 1993); *see Richmond Television Corp. v. United States*, 345 F.2d 901, 907 (4th Cir. 1965) (holding that taxpayer was not "engaged in carrying on any trade or business" until "it obtained the [FCC television] license and began broadcasting"). None of the Alpine entities satisfied that standard. The Tax Court's finding that the Alpine entities were not engaged in any active trade or business was not clearly erroneous.

Broz argues that the Alpine entities were merely a business expansion, not a new business. "The determination of whether there is an expansion of an existing trade or business or a creation or acquisition of a new trade or business is to be based on the facts and circumstances of each case . . . ." Report of the Committee on Finance, Miscellaneous Revenue Act of 1980, S. Rep. No. 96-1036, at 12 (1980). Broz urges us to consider the Alpine entities' activities in conjunction with RFB by disregarding *Bennett Paper* and instead following the Second Circuit's reasoning in *Briarcliff Candy Corp. v. Commissioner*, 475 F.2d 775 (2d Cir. 1973). In that case, a taxpayer who expanded his business in the same corporate entity was not compelled to show that he was actively conducting business in the expanded areas. The Second Circuit held that "expenditures by an already established and going concern in developing a new sales territory are deductible under § 162." *Id.* at 782. Broz asks us to liken his situation to

that of the taxpayer in *Briarcliff Candy* because he claims that in forming the Alpine entities, he merely expanded his business. He argues that he only used distinct corporate entities because he was compelled to do so by CoBank as a condition for continued financing.

*Bennett Paper* directly addressed *Briarcliff Candy* and held that the plaintiff in *Briarcliff Candy* was in a different position because his was a "continuing corporation which merely expanded its existing business." *Bennett Paper*, 699 F.2d at 452. The Eighth Circuit specifically declined to follow the suggestion "that the Commissioner [of Internal Revenue] had a legal duty to pierce the corporate veil with which Bennett had shrouded itself," holding instead "that a taxpayer who adopts a particular form of doing business cannot escape the tax consequences of that chosen form." *Id.* at 451-52 (citing *Comm'r v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974); *Moline Props., Inc. v. Comm'r*, 319 U.S. 436, 438–39 (1943); *Higgins v. Smith*, 308 U.S. 473, 477 (1940); *Burnet v. Commonwealth Improvement Co.*, 287 U.S. 415, 418–19 (1932)). The Eighth Circuit's reasoning is persuasive. The Second Circuit reasoned, in *Briarcliff Candy*, that "[e]very new idea and every change of method in making sales, even in promoting special sales or developing new sales territory, do[es] not require that the expenses connected with the operation be [treated as] non-deductible [startup expenses] under § 162." *Briarcliff Candy*, 475 F.2d at 782. This reasoning is not applicable to Broz's case. Broz formed separate corporate entities to build his cellular telephone business, and whether he did so freely or out of necessity in order to obtain financing is not determinative. Broz cites no authority to support his theory that the joint ownership or interconnected purposes[7] of these entities should guide this court's decision.

---

[7]Moreover, when new activities require different types of FCC licenses, there is reason to treat the new activities as distinct for tax purposes. In *Radio Station WBIR, Inc. v. Commissioner*, 31 T.C. 803, 812 (1959), the Tax Court held that expenses incurred to acquire television-broadcasting licenses were not related to the operation of an AM-FM radio station business: "Though [they are] segments of the same general [broadcasting] industry they are nevertheless distinct businesses and are so recognized by the Government and industry as evidenced by the fact that they are required to obtain a license for each separate operation and each operation may be engaged in without engaging in the others." For that reason, the Tax Court affirmed the commissioner's disallowance of the business-expense deductions related to the acquisition of television-broadcasting licenses. Likewise here, the Alpine entities' effort to use digital FCC licenses to operate a digital cellular network was not necessarily an expansion of Broz's already-existing analog cellular telephone business, RFB, which relied on previously acquired analog FCC licenses.

Like the *Bennett Paper* plaintiff, Broz apparently "wants the best of both worlds" by having the Alpine entities treated as separate for purposes of avoiding or distinguishing liabilities, but treated as one entity together with RFB for tax purposes. *Bennett Paper*, 699 F.2d at 451. Instead, "[t]he choice of the advantages of incorporation . . . require[s] the acceptance of the tax disadvantages." *Id.* at 452 (quoting *Moline Props.*, 319 U.S. at 439 (internal quotation marks omitted)). The Tax Court's holding that Broz's business-expense deductions were disallowed because the Alpine entities were not engaged in carrying on an active trade or business was not based on clearly erroneous factual findings.

*Amortization*

On the amortization issue, the Tax Court correctly determined that because the Alpine license-holding entities were not engaged in an active trade or business, they were not entitled to amortization deductions under I.R.C. § 197 for the FCC licenses they acquired. The Tax Court held that the FCC licenses were amortizable only upon the commencement of a trade or business because § 197 has an "active" trade or business requirement. We review that purely legal determination *de novo*. *The Limited*, 286 F.3d at 331. The Tax Court properly held that under § 197, a taxpayer may begin claiming amortization deductions only upon the active commencement of a trade or business.

I.R.C. § 197 provides:

> **(a)** **General rule.**—A taxpayer shall be entitled to an amortization deduction with respect to any amortizable section 197 intangible. The amount of such deduction shall be determined by amortizing the adjusted basis (for purposes of determining gain) of such intangible ratably over the 15-year period beginning with the month in which such intangible was acquired.

I.R.C. § 197(a). Section 197(c) defines an "amortizable section 197 intangible" as "any section 197 intangible . . . which is held *in connection with the conduct of* a trade or business." I.R.C. § 197(c)(1)(B) (emphasis added).

I.R.C. § 197(a) must be read in conjunction with § 197(c). As the Supreme Court explained in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36 (1998), "a statute is to be considered in all its parts when construing any one of them." Although subpart (a) states that the amount of the deduction is calculated beginning with the month in which the intangible asset is acquired, it also limits deductions to "amortizable section 197 intangibles," which are defined in subpart (c) as intangible assets "held in connection with the conduct of a trade or business." Amortization deductions therefore do not begin upon acquisition of the intangible asset if the intangible asset is not yet held in connection with the conduct of a trade or business, because the assets are in that case not eligible as "amortizable section 197 intangibles."

The fact that § 197(c) employs the phrase "in connection with" does not mean that § 197 imposes only a "passive" business or trade requirement, even though that phrase has been interpreted in other parts of the tax code to mean that deductions can be taken before actual business operations have begun.[8] Broz emphasizes the importance of the phrase "in connection with" in § 197(c), but the Tax Court properly reasoned that the inclusion of the word "conduct" indicates that the trade or business must actually *be conducted* before the asset qualifies as amortizable. Although I.R.C. § 174 uses the "in connection with" language and has only a passive business requirement, it is distinguishable because it does not include the word "conduct." The plain meaning of all the words found in § 197 indicates that amortization deductions begin only when the trade or business is actually being conducted, even if the intangible asset was acquired earlier.

---

[8] For example, "in connection with" appears in I.R.C. § 174, under which a taxpayer may claim research-and-development cost deductions even if not actively engaged in a trade or business at the time of the expenditure. "A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year *in connection with* his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction." *See* I.R.C. § 174(a)(1) (emphasis added).

Legislative history does not require a different result. Because Congress inserted the word "used" in § 167,[9] which deals with business-expense deductions for tangible assets, to expressly include an active-business requirement in that section, Broz argues, by negative inference, that by not inserting "used" into § 197, Congress implicitly avoided imposing an active-business requirement in § 197. However, Broz ignores an important Treasury Department decision, which indicates that broader language was seen as necessary in crafting § 197 because "it applies to assets, such as goodwill, that although held in connection with the conduct of a trade or business are not commonly viewed as being used in the trade or business" in the same way tangible assets under § 167 are viewed. T.D. 8865, 2000-1 C.B. 589, 2000 WL 51167, at *3822 (2000). The decision specifically notes that "there is no suggestion in the legislative history that Congress intended to apply a rule differing" from the one applied to tangible assets under § 167. *Id.*

The Alpine license-holding entities were formed solely to acquire and lease FCC licenses for use in Broz's cellular telephone business venture. They never actually leased the licenses for such use, meaning that the licenses were never held in connection with a trade or business that was actually being conducted. As a result, the FCC licenses never qualified as "amortizable section 197 intangibles" under § 197(c), and were therefore ineligible for amortization deductions.

The S Corporation debt basis limit in § 1366 does not apply to the Alpine license-holding entities, which are limited liability companies taxed as partnerships, although the at-risk limit in § 465 does apply to them. *See* Richard Lipton, et al., *Partnership Taxation* § 4.07(B) (3d ed. 2012); Howard E. Abrams, *New Changes to the At-Risk Rules*, 6 J. Passthrough Entities 37, 44 (2003) ("The at-risk rules of Code Sec. 465 are yet another hurdle that must be overcome if partnership-level deductions are to find their way onto a partner's tax return."). Regardless, because the Tax Court properly

---

[9]Section 167 reads: "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property *used* in the trade or business, or (2) of property held for the production of income." I.R.C. § 167(a) (emphasis added).

held that the license-holding entities were never actively conducting a trade or business, as required to make amortization deductions under § 197, the Tax Court's rulings denying the business expense and amortization deductions must be upheld.

The judgment of the Tax Court is affirmed.